[No. G039141. Fourth Dist., Div. Three. June 30, 2008.]

Adoption of ALLISON C., a Minor.
DARIO A., Plaintiff and Respondent, v.
JOHN C., Defendant and Appellant.

1006

---

**COUNSEL**

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Leslie A. Barry, under appointment by the Court of Appeal, for Plaintiff and Respondent.

## OPINION

**IKOLA, J.**—John C. (father) appeals from a judgment terminating his parental rights and freeing his daughter, Allison C. (now seven years old), from his custody and control due to abandonment under Family Code section 7822.[1] Dario A. (stepfather) filed the section 7822 petition as a precursor to adopting Allison without father's consent. Father contends (1) insufficient evidence supports the court's finding he abandoned Allison, and (2) the court misapplied the law in reaching this determination. We disagree and affirm the judgment.

## FACTS

When Allison was conceived, her mother (mother) was dating father while married to his brother.[2] After Allison's birth in March 2001, mother and Allison lived with father on and off for about 110 days during the child's first six months of life. But in the summer of 2001, father struck mother as she held Allison, causing mother to move to a relative's home with the child and to stop all contact with father. From October 2001 through February 2003, father was incarcerated for domestic violence. After father's release from prison in February 2003, he visited Allison (without mother's knowledge) at his brother's house every weekend through September 2003. Mother, upon learning of these visits, informed father's brother that he (father's brother) could see Allison only with mother present. Starting in September 2003, father was incarcerated for second degree burglary.[3] He testified that while incarcerated, he sent Allison cards until "notified by the prison" at some unspecified time that stepfather or mother had advised the prison father was not allowed to contact the child.

Meanwhile, stepfather had been involved in Allison's life since early 2003; in February 2005, he married mother. In April 2005, stepfather filed with the court a request to adopt Allison, then four years old.

---

[1] The record contains no written judgment. In the interests of justice and to avoid delay, we exercise our discretion to deem the court's July 25, 2007 minute order an appealable final judgment. (*In re Clarissa H.* (2003) 105 Cal.App.4th 120, 122, fn. 2 [129 Cal.Rptr.2d 223].)

All statutory references are to the Family Code unless otherwise stated.

[2] Mother divorced father's brother in June 2002.

[3] Father's opening brief acknowledges "it is unclear" whether his term began in October of 2003 or of 2004. Father testified to both dates, as well as to a specific start date of September 19, 2003. Father's testimony he served an "approximately" 22-month term and was released in July 2005 suggests his incarceration began in 2003.

A July 2005 DNA test showed father was Allison's biological father. Also that month, father was released from prison.

Orange County Probate Court Services (PCS), in its August 2005 adoption report, concluded stepfather had been a "stable and suitable parent for" Allison and was a "fit and proper person to adopt" her. Stepfather had no criminal record and no substance abuse or domestic violence concerns, was in good health, made a good income, provided Allison with "suitable living accommodations," and had "been involved with all aspects of Allison's parenting" since 2003. PCS concluded "stepparent adoption appear[ed] to be in [Allison's] best interests." But PCS reported father had informed the agency that "at no time [would he] ever consent to the adoption."

Also in August 2005, the court issued a restraining order against father to protect both mother and Allison. The order allowed father "to have supervised visitation with Allison" for two hours every Saturday commencing in September 2005. Mother then asked father's parole officer to have father "drug tested at least a couple of times a week," for Allison's safety if father visited the child. Father's parole officer responded by prohibiting father from seeing Allison, but the special parole condition allowed father to contact the child by telephone or mail with a "supervising parole agent['s] prior approval." Father never tried to obtain such approval, but did file an inmate parolee appeal and a citizen's complaint contesting the parole officer's action.

In September 2005, stepfather and mother petitioned under section 7662 for a determination of father's parental rights over Allison, asking whether father's consent was necessary for stepfather's adoption of the child. The court found father to be Allison's presumed father under section 7611, subdivision (d) (receives child into home and holds child out as natural child), because father had custody of the child for 110 days during her first eight months of life.

From May to September of 2006, father was incarcerated for violating parole.

In October 2006, stepfather petitioned the court to declare Allison free from father's parental custody and control under section 7822 (parental abandonment) or section 7825 (parent convicted of felony). Specifically, stepfather and mother sought to have father's parental rights terminated under section 7822, alleging father had left Allison in mother's custody for at least four years, had *"never* paid or offered to pay child support since Allison's

birth," and had "not had any contact with [Allison] for a period exceeding one year." Alternatively, stepfather and mother sought to have father's parental rights terminated under section 7825, subdivision (a), alleging father was a "habitual criminal" who had been convicted of and sentenced to prison for at least one felony. Stepfather alleged Allison lived "in a loving and nurturing home" with stepfather and mother, and it was in her best interest to be declared free from father's parental custody and control so she could be adopted by stepfather.

In PCS's report prepared for the hearing on stepfather's petition, PCS concluded Allison was "an abandoned child as defined in section 7822 . . . and it [was] in [her] best interest . . . to be freed from the parental custody and control of [father], so she [could] be adopted by [stepfather]."

From October 2006 to April 2007, father was incarcerated for driving under the influence of alcohol.

At the July 2007 hearing on stepfather's petition under section 7822 to have Allison declared free from father's custody and control, mother, stepfather and father testified. Allison's counsel argued father's parental rights should be terminated.

The court granted stepfather's petition after finding by clear and convincing evidence that father had left Allison with mother for over a year without communication or support and with the intention to abandon the child, and that Allison's best interest required father's parental rights to be terminated.[4]

## DISCUSSION

*Substantial Evidence Supports the Court's Order Declaring Allison Free from Father's Parental Custody and Control*

Father contends insufficient evidence supports the court's findings (1) he left Allison in mother's care and custody, (2) he did not support or communicate with her, and (3) he intended to abandon Allison.

██ Section 7800 et seq. governs proceedings to have a child declared free from a parent's custody and control. The purpose of such proceedings is

---

[4] The court found insufficient facts to support granting stepfather's petition under section 7825.

to promote the child's best interest "by providing the stability and security of an adoptive home." (§ 7800.) The statute is to "be liberally construed to serve and protect the interests and welfare of the child." (§ 7801.)

█ Under section 7822, a court may declare a child free from a parent's custody and control if the parent has abandoned the child. Abandonment occurs when a "parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, *or* without communication from the parent, with the intent on the part of the parent to abandon the child."[5] (§ 7822, subd. (a), italics added.) Thus, a section 7822 proceeding is appropriate where "three main elements" are met: "(1) the child must have been left with another; (2) without provision for support or without communication from . . . his parent[] for a period of one year; and (3) all of such acts are subject to the qualification that they must have been done 'with the intent on the part of such parent . . . to abandon [the child].' " (*In re Cattalini* (1946) 72 Cal.App.2d 662, 665 [165 P.2d 250] (*Cattalini*).) "The . . . failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent . . . ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent . . . ." (§ 7822, subd. (b).)

An appellate court applies a substantial evidence standard of review to a trial court's findings under section 7822.[6] (*Amy A., supra*, 132 Cal.App.4th at p. 67.) Although a trial court must make such findings based on clear and convincing evidence (§ 7821), this standard of proof " 'is for the guidance of the trial court only; on review, our function is limited to a determination whether substantial evidence exists to support the conclusions reached by the trial court in utilizing the appropriate standard.' "[7] (*In re B. J. B.* (1986) 185 Cal.App.3d 1201, 1211 [230 Cal.Rptr. 332].) Under the substantial evidence standard of review, " '[a]ll conflicts in the evidence must be resolved in favor

---

[5] "Section 7822 became operative in 1994. [Citation.] The language that currently appears in section 7822, requiring as a prerequisite for abandonment that a child be 'left' in the care and custody of another person, previously appeared in nearly identical form in former Civil Code section 232, subdivision (a) [citation], and prior to that, in former Welfare and Institutions Code section 701 [citation]." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68, fn. 4 [33 Cal.Rptr.3d 298] (*Amy A.*).) Some case law cited in our opinion was decided under these predecessor sections.

[6] Father asserts section 7822 findings involve mixed questions of law and fact subject to a substantial evidence standard of review as to factual findings and de novo review as to "the court's applying the facts to the incorrect legal standards." But the court applied the correct legal standards, as discussed below in the second section of this opinion.

[7] Here, the trial court expressly stated it applied the clear and convincing standard of proof in making its findings.

of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment.' " (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 549 [243 Cal.Rptr. 763].) Abandonment and intent " 'are questions of fact for the trial judge . . . . His decision, when supported by substantial evidence, is binding upon the reviewing court. An appellate court is not empowered to disturb a decree adjudging that a minor is an abandoned child if the evidence is legally sufficient to support the finding of fact as to the abandonment [citations].' " (*Ibid.*) "The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947 [124 Cal.Rptr.2d 688] [this burden of proof is applicable in dependency and other appeals].)

On appeal father contests the court's findings on all three elements of the section 7822 determination of abandonment. He first contends insufficient evidence supports the court's finding he left Allison in mother's care and custody for at least one year. He argues the term " 'left' connotes voluntary action" and therefore "abandonment does not occur when the child is taken from parental custody against the parent's wishes," relying on *Amy A., supra,* 132 Cal.App.4th 63. While acknowledging he "was incarcerated at different time periods from 2001 through" 2007, father argues his incarceration was involuntary. He further asserts mother left father and tried "at every turn to cut off any contact between Father and his daughter," including by discontinuing Allison's visits to father's brother's house, obtaining a restraining order against father, and persuading father's parole officer to disallow visitation. He concludes "petitioners failed to prove at trial that Father voluntarily allowed Mother to assume custody."

In *Amy A.,* the father argued " ' "actual desertion" ' is required" to show abandonment, and because the mother "was the one to physically move with [the child] to [another state], he [could not] have 'left' [the child] in [the mother's] care and custody within the meaning of section 7822." (*Amy A., supra,* 132 Cal.App.4th at pp. 68, 69.) The Court of Appeal disagreed, "conclud[ing] that a parent may be found to have 'left' a child in another person's care and custody within the meaning of section 7822 even when the child moves away with the other parent." (*Id.* at p. 69.) The appellate court explained that a "parent 'leaves' a child by ' "*voluntarily surrender*[*ing*]" ' the child to another person's care and custody." (*Ibid.*) "Case law consistently focuses on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent." (*Ibid.*)

We thus consider whether father voluntarily surrendered Allison's custody and care to mother. We conclude substantial evidence supports the

court's finding he did just that. In the summer of 2001 father, by his voluntary act of domestic violence, left Allison in mother's care and custody. Thereafter, he never sought to take parental responsibility for Allison's care, and instead chose to let the child stay with mother. In other words, he was content to leave to mother all real parental responsibility for Allison. His actions underlying his incarcerations for domestic violence, burglary, and driving under the influence were voluntary, and in any case, "being incarcerated does not, in and of itself, provide a legal defense to abandonment of children." (*In re Rose G.* (1976) 57 Cal.App.3d 406, 424 [129 Cal.Rptr. 338].) Even when father was out of prison in 2003 and routinely visited Allison at his brother's house, he did so secretly, rather than seeking custody or visitation rights. Mother's efforts to curtail father's communication with Allison, while relevant to an assessment of whether father *intended* to abandon the child by noncommunication (an issue we discuss below), do not negate the reality he never sought to take custody or care of the child after mid-2001. In sum, he voluntarily abdicated the parental role. Thus, the court did not err by finding father left Allison in mother's care and custody from 2003 to October 2006.

We next examine whether substantial evidence supports the court's finding father failed to support Allison from September 2003 to December 2006. Father testified he never paid "any child support for Allison," but gave his brother "close to $800" in 2003 because they "had her on the weekends," and brought the child toys, food and clothes when visiting her during that year. He also testified that, at the time of the section 7822 hearing, he had saved "about $300" for Allison.

The court found that, even giving father credit for $1,100 in monetary support, this amount was "de minimis," insufficient, and "token" for the period from March 2003 through October 2006 (the date of stepfather's § 7822 petition), in light of the cost of "medical care, . . . food, clothing and shelter" for a child in Orange County. The court recognized father's ability to provide support was limited due to his incarceration but noted that if incarceration were an acceptable excuse for nonsupport, "a child could [conceivably] never be adopted." The court further noted a parent's incarceration results from his or her own actions.

Substantial evidence supports the court's finding father failed to support Allison from September 2003 through December 2006. Other than the $300 father claimed to have saved for Allison, father provided her with no support after September 2003, i.e., a period of over three years; the statute requires only a one-year period of nonsupport.

Finally, father contests the court's finding he intended to abandon Allison. He first argues his nonsupport of Allison cannot serve as presumptive evidence he intended to abandon the child because mother "apparently" never obtained a support order and never asked him for "money or supplies" for Allison. He argues "[f]ailure to contribute support in the absence of demand does not prove an intent to abandon," quoting from *In re George G.* (1977) 68 Cal.App.3d 146, 159 [137 Cal.Rptr. 201] (*George G.*), and "[e]vidence of a parent's inability to pay support rebuts presumption of abandonment," quoting *Cattalini, supra,* 72 Cal.App.2d at page 667.[8] In response, stepfather relies on *In re Randi D.* (1989) 209 Cal.App.3d 624 [257 Cal.Rptr. 421] (*Randi D.*), which stated: " 'Although a parent's failure to contribute to his child's support absent demand does not necessarily show abandonment, such failure coupled with failure to communicate, may do so.' " (*Id.* at p. 630.) Similarly, " 'failure to pay for maintenance when no demand therefor has been made [citations], or no ability to provide is shown [citations], *by itself,* does not prove an intent to abandon.' " (*In re Baby Boy M.* (1990) 221 Cal.App.3d 475, 482 [272 Cal.Rptr. 27] (*Baby Boy M.*), italics added.)

Here, the court found father failed to communicate with Allison from September 2003 to December 2006. The court explained that after 2003 father had no direct contact with Allison, failed to make adequate efforts to communicate by letters, and therefore had not bonded with her. The court noted father's incarceration had "removed him from contact with the child." As to father's testimony he tried to send Allison cards and letters "[a]ll through her life," the court was entitled to disbelieve or discount that testimony (and apparently did so, since it expressly found father made inadequate efforts to communicate by letters). Finally, father failed to seek permission to contact Allison by telephone or mail in late 2005, despite the special parole condition entitling him to do so.

The court's finding father failed to communicate with Allison from September 2003 to December 2006, coupled with its finding of nonsupport for the same period, are sufficient to show father intended to abandon her for that period. *Randi D.* and *Baby Boy M.* support this conclusion and are more current than father's cited cases, *George G.* and *Cattalini.* Nor are *George G.* and *Cattalini* inconsistent with *Randi D.* and *Baby Boy M.,* as they state only

---

[8] Father also contends the court's finding he failed to support Allison (discussed above) was unsupported by substantial evidence because mother failed to demand support. But father's cited authorities reveal that an absence of demand may be significant to the third element of section 7822 abandonment, i.e., whether a parent *intended* to abandon a child, but not to the second element of whether a parent actually supported a child.

that nonsupport, absent demand or ability to pay, cannot, *standing alone*, prove intent to abandon or trigger the presumption of intent to abandon. (*George G., supra*, 68 Cal.App.3d at p. 159; *Cattalini, supra*, 72 Cal.App.2d at p. 667.) Furthermore, *George G.* and *Cattalini* are factually distinguishable from the case at hand. In *George G.*, the parents voluntarily allowed the child to stay with licensed foster parents so the foster parents could support the child with AFDC (Aid to Families with Dependent Children) funds forgone by the mother, and the parents continued to visit the child. (*George G., supra*, 68 Cal.App.3d at pp. 152–154.) In *Cattalini*, the father was expressly requested by the mother and her husband *not* to support the children with money or gifts, and there was evidence the father maintained communication with the children, and father "kept insisting that he had no intention of giving up his children." (*Cattalini, supra*, 72 Cal.App.2d at pp. 666–668.) Moreover, *Cattalini*, decided in 1946, stated, contrary to the legislative mandate in current section 7800 that the interests of the child be served and protected: "[W]here absolute severance of the relation of parent and child is sought 'the inclination of the courts, as the law contemplates it should be, is in favor of maintaining the natural relation,' and '[e]very intendment should have been in favor of the claim' of the parent under the evidence, and 'if the statute was open to construction and interpretation should be construed in support of the right of the natural parent.' " (*Cattalini, supra*, 72 Cal.App.2d at p. 669.) *Cattalini* applied Welfare and Institutions Code section 701, a predecessor statute to Civil Code section 232, which preceded section 7822. Welfare and Institutions Code section 701 (together with other sections in the statutory article) contained no equivalent mandate to prioritize the child's best interests. (*Cattalini, supra*, 72 Cal.App.2d at p. 665; Stats. 1937, ch. 369, §§ 700–702, pp. 1031–1033.)

But on the issue of intent to abandon, father further argues the court found he "never intended and does not intend to abandon Allison." As we shall discuss, father misconstrues the court's words. Viewing the court's remarks on intent to abandon in their entirety, it is clear the court found father intended to abandon Allison for the statutory period of time. At the outset of its relevant remarks, the court recognized the difficulty of proving a parent's intent to "permanently" abandon a child, and noted the law therefore requires abandonment only "for the statutory period of time," citing *In re Daniel M.* (1993) 16 Cal.App.4th 878 [20 Cal.Rptr.2d 291] (*Daniel M.*). The court then stated to father: "I appreciate . . . that you never intended and don't intend to abandon the child. [¶] And that's true of virtually every parent I've seen that opposed a termination, but that's not the test. [¶] As said in *Daniel M.*, all that is necessary is for the lawful period to go on, the noncommunication, the nonsupport for the statutory period of time—in this case that would be for a period of one year—that would be sufficient for saying you abandoned the child. [¶] It doesn't have to be the intent to permanently abandon. Just for the

statutory time . . . ." The court then made the following formal finding: "[T]he court finds that was not done with an intent to abandon for the statutory period of time, because I recognize that you have never intended to abandon that child, but for the statutory period of time that we are considering." Based on the court's earlier comments and the inconsistencies evident in its formal finding, it is clear the court misspoke when it stated, "that was not done with an intent to abandon for the statutory period of time." Rather, the court meant to express its finding father did not intend to *permanently* abandon Allison. This is also evident from the court's finding father presumptively intended to abandon Allison because he did not support or communicate with her for over one year. In addition, the minute order confirms the court's finding father intended to abandon Allison for the statutory period.[9]

*The Trial Court Correctly Applied the Law in Finding Father Intended to Abandon Allison*

Father contends the court "misapplied statutory construction and case law to conclude that father abandoned his daughter." In father's view, "the court regarded Father's past incarceration as an indication that he would never be available as a full time parent for Allison." He asserts the court liberally construed section 7822 and *Daniel M., supra,* 16 Cal.App.4th 878, "and adopt[ed] an adverse view of merely the status of being an incarcerated parent," and thereby "unfairly shift[ed] to Father the impossible burden of overcoming section 7822 rather than holding petitioners to the required burden of proof."

In *Daniel M.,* the Court of Appeal interpreted Civil Code former section 232 (§ 7822's predecessor statute) to "require intent to abandon for the statutory period only," rather than permanently. (*Daniel M., supra,* 16 Cal.App.4th at p. 881.) The court based its interpretation on the statute's purpose " 'to serve the welfare and best interests of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from his or her life' " (Civ. Code, former § 232.6), and the Legislature's directive "that proceedings to terminate parental rights 'shall be determined as expeditiously as possible' ([Civ. Code,] § 232.3) and that [Civil Code] section 232 'shall be liberally construed to serve and protect the interests and welfare of the child.' ([Civ. Code,] § 232.5.)" (*Daniel M., supra,* 16 Cal.App.4th at p. 884.) These purposes "would be defeated if the intent to abandon requirement . . . were interpreted to 'allow an absent parent to totally forsake and desert his [or her] child for years at a time without fear of

---

[9] Father also challenges mother's credibility as a witness, but witness credibility is in the province of the trial court. (*In re Kristin W.* (1990) 222 Cal.App.3d 234, 251 [271 Cal.Rptr. 629].)

[losing] parental rights simply because he [or she] had the intent to reestablish the parent-child relationship at some indefinite time in the future.' " (*Id.* at p. 884.) Under that construction, a parent could deny an abandoned child "an adoptive home merely by planning to resume relations with the child when he or she near[ed] adulthood"; such a child might "effectively . . . be compelled to endure a childhood without any parents at all." (*Ibid.*) "[A] child's need for a permanent and stable home cannot be postponed for an indefinite period merely because the absent parent may envision renewing contact with the child sometime in the distant future. . . . 'The reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself.' " (*Ibid.*, citations omitted.)

Here, the court explained its reasoning at length in its oral statement of decision. It first stressed the statute's "overall philosophy"—expressed in section 7800—to serve the child's best interest by providing the stability and security of an adoptive home where those conditions are otherwise lacking. Noting section 7890's mandate that a court " 'bear[] in mind the age of the child,' " the court observed that Allison was then six years old and had lived in stepfather's home for "about a couple years now." Relying on *Daniel M.*, the court focused on whether father intended to abandon Allison for at least one year. The court noted Allison, at age six, was "[o]ne-third of the way to majority," and stated: "[I]f a parent is incarcerated for . . . five [or] ten years, . . . to say you can't adopt this child because . . . you are incarcerated, unable to support or communicate with the child for that period of time because of your incarceration, [is not] fair to the child." As *Daniel M.* explained, the end result could be that "the child would never be adopted." The court explained at length the basis for its findings father failed to support or communicate with Allison for the statutory period. The court noted stepfather is a "good, stable person" providing a stable home. In sum, the court looked at "whether the elements have in general been met and whether they complied with the statute and whether the termination of the parental rights is in the best interests of the child."

We are more than satisfied the court correctly applied the law. The court's detailed statement of decision revealed it considered father's voluntary actions underlying his incarcerations as well as his other actions while not incarcerated and while in prison. " '[T]he question whether such intent to abandon exists and whether it has existed for the statutory period is a question of fact for the trial court, to be determined upon all the facts and circumstances of the case.' " (*In re Brittany H., supra,* 198 Cal.App.3d at p. 550.) The court did not err in finding father abandoned Allison for at least one year under section 7822.

## DISPOSITION

The judgment is affirmed.

Bedsworth, Acting P. J., and Moore, J., concurred.