Filed 10/15/13  In re A.P. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.P., a Person Coming Under the Juvenile Court Law. | |
| DAWN G., | F066285 |
| Petitioner and Respondent, | (Super. Ct. No. S-1501-AT-3104) |
| v. | |
| MICHAEL P., | **OPINION** |
| Objector and Appellant. | |

-ooOoo-

<u>**THE COURT**</u>*

APPEAL from a judgment of the Superior Court of Kern County.  James L. Compton, Commissioner.

Linda J. Conrad, under appointment by the Court of Appeal, for Objector and Appellant.

Dawn G., in pro. per., for Petitioner and Respondent.

-ooOoo-

---

*        Before Levy, Acting P.J., Franson, J. and Peña, J.

Michael P., father, appeals from a judgment granting a petition, pursuant to Family Code section 7822[1], declaring his daughter A., free from his custody and control. The petition was brought by Dawn G., A.'s mother.

Father contends that there is insufficient evidence to support the trial court's findings. We disagree and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Father and mother met in July of 2001 and A. was born in July of 2002. Father was not listed as A.'s father on her birth certificate. Father and mother separated and, in February of 2003, they were awarded joint legal and physical custody of A., with primary custody awarded to mother and weekly Friday through Sunday visitation with father. Father was later ordered to pay child support in the amount of $254 per month. Mother claimed she left father in 2003 due to increasing domestic violence.

Father lost contact with mother and A., but eventually discovered they were living in a Long Beach domestic violence shelter. Father filed an action in Mojave for child concealment against mother.

In August of 2004, the trial court discharged the contempt matter against mother and denied father's motion for change of custody. The parties stipulated that father would have weekly custody for three days from Friday through Sunday, as previously ordered. The court further ordered that mother would notify father of any change in address within Kern County and neither party was to move A.'s residence out of the county without written permission of the other parent or a court order.

According to mother, she and father reconciled for three months in 2004, but separated again after mother alleged further domestic violence. Mother moved with A. to a home on Quarter Avenue in Bakersfield; father moved to Ridgecrest.

---

[1] All further statutory references are to the Family Code unless otherwise stated.

In March of 2006, father separated from his then wife, Amy, and moved into his mother's home on Norma Street in Ridgecrest. A., who was now nearly four years old, spent three days visiting father at that address. At the time, A. and mother were living with mother's husband, Robert G., whom she had married sometime in 2003.

According to mother, in May of 2006, father came over unannounced with A.'s belongings. When mother brought A. to the door, father gave A. a kiss on the forehead, said he loved her and would miss her, and then left. Mother claims that was father's last contact with A.

Father claimed he stopped visiting A. in 2006 because he no longer had a driver's license and Amy would not drive him to visits. Amy took the vehicle and all of their property. Father had no money or employment and was disabled due to a 2005 assault in which he was beaten by three individuals. Father contacted mother and said he could not provide transportation for visitation, but mother told father he would have to pick up A. to see her.

After his last visit with A., father went to Oregon for six months to look for work. He did not change his address and, because he was separated from Amy, she turned off his cell phone.

In September of 2006, father returned to California and telephoned mother using his brother's land line. Father left mother a message where she could return his call, but she did not. Father tried to contact mother many times after 2006, but he could not find her. He stopped calling because he did not think he could get through to her. He searched the internet to try and find mother and A.

Father claimed he tried to contact mother in 2007, but he did not know where she and A. were living. He thought mother had moved from the house she shared with Robert, but mother did not notify or call him when she left that house. When father tried to call mother, he got an automated message on an answering machine. He did not call again after that because he thought the phone was disconnected.

3.

Sometime before Christmas of 2007, father's mother helped him research mother's address on the internet, but was unsuccessful. Father was also unable to locate mother through the child abduction unit because he lived 100 miles from Bakersfield and had no transportation to file the necessary paperwork.

According to mother, she and A. lived with Robert in Bakersfield until November of 2007. After that, she moved in with her mother on Horsethief in Tehachapi. Mother did not inform father of the address changes because she did not know where he was located. Mother thought that, since father had not had contact with A. for a few years, it was no longer in A.'s best interest to have contact with him because she would not remember him. But mother claimed she never tried to keep A. away from father, except when she was in the domestic violence shelter in 2003.

In February of 2008, Robert shut off mother's cell phone. Mother thought father could contact her through her mother and stepfather, because their home and cell phone numbers had not changed since 2004 and father had contacted mother on all of those numbers previously.

In June of 2008, mother and A. moved to Al Hatta Court in Tehachapi. Mother did not inform father of this move, claiming she could not locate him, and she acknowledged that he had no idea where she lived after she moved there. After Al Hatta, mother moved in with a boyfriend on Quail Spring. Sometime later, she moved again, this time to live with her brother on Monterey Street.[2]

During 2008, father looked "some more" for mother's address on the internet. Father did not file further contempt charges against mother because he was told by court personnel in Mojave that he needed mother's address in order to do so.

Mother testified that she learned father was in jail in July of 2009, but she did not send him any notices of where she was while he was in jail. Mother and A. lived in

---

**2**      Mother did not say in which city these streets were located.

4.

Canada from November of 2009 through January of 2011, with a three-month stint in Washington. Mother admitted that she did not try to contact father to let him know where she was after 2009.

In January of 2011, after mother returned from Canada, she and A. lived with mother's mother and stepfather in Stallion Springs, near Tehachapi. One month later, mother moved in with father's former wife Amy in Lancaster.[3] Mother admitted that she violated the court order by failing to tell father where she lived. At some point, mother moved to a rural part of Tehachapi. Mother and A. lived with mother's new boyfriend, Eddie, and the two talked about getting married. Eddie wanted to adopt A.

In September of 2011, father received a letter from mother asking if he was "Michael [P.]" The letter was sent to his Ridgecrest address, the same address he had in 2006. The letter had a post office box as the return address. Father did not respond to the letter, but went to the sheriff's station in Rosamond to get help in finding mother's home address so he could try to get visitation with A. Father also contacted the Department of Child Support Services for assistance in locating mother, but they would not tell him her home address. Father took the 2004 court order to the police department in Rosamond to try to get them to enforce the terms of the contract, but they said they could not help.

Mother filed a petition on November 28, 2011, requesting father's parental rights be terminated pursuant to section 7822. Mother's address was listed on Horsethief Drive in Tehachapi; father's "last known whereabouts" was listed on Norma Street in Ridgecrest.

In the investigator's report filed April 4, 2012, the investigator reported that A., who was then nine years old, lived with mother in Tehachapi, was doing very well academically, played soccer and was on the student council at school. According to the

---

[3] According to mother, father and Amy had a child, which would be A.'s half sister whom A. visited from time to time.

5.

investigator, A. had no understanding of the purposes and consequences of the petition. While she was aware that Michael P. was her father, she "seem[ed]" to have no memory of him.

Mother told the investigator that father became increasingly abusive during her pregnancy with A. and was abusing alcohol, marijuana and methamphetamine. Mother said she left father in August of 2003 and went to a domestic violence shelter. Although they reconciled for three months in 2004, she again left him due to his violence and substance abuse. In 2005, father moved to Ridgecrest with Amy and mother moved to Bakersfield. According to mother, father saw A. about three times during 2005 and 2006 and had no contact with her after May of 2006.

The investigator reported that mother was married to Robert from 2003 to 2009. An allegation by Child Protective Services against mother of general neglect for children witnessing domestic violence, lack of a safe home and harmful relationships was substantiated in December of 2002.

The investigator was unable to contact father. A certified letter was sent to father's last known address on February 23, 2012, but it was returned as "unable to forward." The investigator reported that a "thorough and diligent search" had been conducted, but there was no information regarding father's whereabouts. Father had a substantial history with Child Protective Services in 2002 for general neglect, and in 2003 for emotional and physical abuse, substantial risk and throwing "baby" overhead and shaking her while calling her derogatory names.

The investigator concluded that the allegations in the petition appeared to be true and met the legal standards under section 7822, subdivisions (a) and (b). Mother had told the investigator that father had made no efforts to contact her since May of 2006 and never paid child support. Mother told the investigator that father could have contacted her through her ex-husband Robert or her mother, both of whom lived at addresses

known to father and would have been able to provide father with a current address for mother.

On April 20, 2012, father contacted mother requesting to visit A. Mother acknowledged that she refused father's request.

In a supplemental report filed May 29, 2012, the investigator reported that father confirmed that he last saw A. in November of 2006, when he picked her up from Robert's home. He and Robert got into an argument when he returned A. Thus, from that time forward, father was fearful of contacting Robert for mother's address. According to father, he did not know mother's mother's address or telephone number. Father became aware of mother's address in November of 2011, when his ex-wife Amy told him where mother lived. He then filed for visitation, a case that was pending due to the section 7822 petition. Father stated that he had not pursued visitation previously through the court because mother's address was unknown to him and that he had been working. The investigator again recommended that the petition be granted.

At the hearing on the petition, mother testified that she thought A. had adjusted well to not having father in her life and that terminating his parental rights would be in A.'s best interest. She felt it would be detrimental for father to communicate or visit her. According to mother, A. did not ask for contact with father. Mother was afraid for A.'s safety due to previous domestic violence and father's history of drug and alcohol abuse. Mother testified that A. had a mood disorder, took medication, and received academic services. Mother did not think that A. remembered father and his efforts as a father were minimal. Mother testified there was a child support order in effect, but that he had made only one payment in February of 2007 and one payment in October of 2012. Mother thought he owed about $30,000 in back child support.

According to father, he was trying to pay child support. He was making arrangements with the Department of Child Support Services for repayment and would be getting his arrears balance soon.

7.

Counsel for father argued that mother concealed where she had been living for the past five years, that she violated the court order and removed A. from the jurisdiction, that she knew where father had lived since 2006, and that she therefore had not established father had an intent to abandon A. Counsel further argued that father had tried to locate mother. He had a court order he tried to enforce, but was unable to without an address. Counsel also noted that father was working with the Department of Child Support Services to make payments.

Counsel for A. stated that A. had requested that counsel inform the court that A. knew her father's name, but she did not remember him, and that she last saw him when she was four years old. A. did not want to see her father because she could not understand why he would want to see her after six years of not seeing her. A.'s counsel surmised that, since father was able to locate mother successfully in 2004 or 2005 through the child abduction unit, he could have made more efforts to do so in 2007. But A.'s counsel also stated that it was hard to believe anything mother said as well.

Mother herself argued that there was no documentation that father lived at the Ridgecrest address before 2012. According to mother, father never made child support payments willingly. She denied trying to hide her daughter from father, but that A. had told her she did not want to see him.

In its written order granting the petition, the trial court found father "wil[l]fully failed to contact the child in excess of a year or provide financial support." (Full capitalization omitted.) The court stated that it was a close case because both parents were culpable as to why visitation had not taken place. The court was concerned about reintroducing A. to her father after six years. In making its ruling, the court stated:

> "This is a very difficult situation for me.… I think there's culpability on both parties part as to why visitation hasn't taken place. But the fact of the matter is we are now six years plus down the line from the last visit. When the child was four years old, she last saw her father. [¶] I would agree that petitioner … did not make it easy to be found. I don't think she was

actually hiding, though, either.  [¶]  I clearly believe that … at this point it's a [weight] thing between how traumatic it's going to be for the child to try to be re-introduced to the father versus terminating the rights….  [¶]  This would have been a lot different situation [were] we … two, even three years down the line here.  The father has … show[n] that he's been in law enforcement checking records.  I think [he] has lost track of her.  I think although he has not made good faith efforts to try and find the child and probably the mother, like I said mother I think she is culpable for not having providing him with her information.  [¶]  But I think father [has] at this point willfully failed to maintain contact with the minor child for a period in excess of a year or provide for the child's financial well-being.  [¶]  I find it to be in the child's best interest at this point to grant the petition and I am going to grant at this time the petition terminating parental rights."

## DISCUSSION

Father contends there is no substantial evidence to support the trial court's conclusion that he abandoned A.  We find that the record supports the trial court's decision and we affirm.

"When an appellant asserts there is insufficient evidence to support the judgment, our review is circumscribed.  [Citation.]  We review the whole record most favorably to the judgment to determine whether there is substantial evidence - that is, evidence that is reasonable, credible, and of solid value - from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof."  (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298; see also *In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1211.)[4]

Section 7822 provides in pertinent part: "(a) A proceeding under this part may be brought if … [¶] … [¶] (3) One parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child."  The governing statutes must be "liberally construed to serve and protect the interests and welfare of the child."  (§ 7801.)  Failure to communicate or

---

[4]     *In re B.J.B., supra,* construed former Civ. Code, § 232, section 7822's predecessor statute, as do other pre-1994 cases in this opinion.

9.

provide support "is presumptive evidence of the intent to abandon."  (§ 7822, subd. (b).)  The court can find abandonment if the parent has made "only token efforts to support or communicate with the child …."  (*Ibid.*)  The parent need not intend to abandon the child permanently; it is enough if the parent intends to abandon the child during the one year statutory period.  (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 885.)

The trial court must find an intent to abandon by clear and convincing evidence.  (*In re B.J.B., supra,* 185 Cal.App.3d at p. 1211; § 7821.)  The evaluation of a witness's credibility is delegated to the trial court.  (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1015, fn. 9.)  The factual determination of intent to abandon is made by objectively measuring the parent's conduct.  (*In re B.J.B., supra,* at p. 1212.)  The trial court considers the frequency of times the parent tried to communicate with the child, the genuineness of the effort under all the circumstances and the quality of any communications that occurred.  (*Ibid.*)

Father contends first that there was insufficient evidence that he intended to abandon A. because any attempts he made to communicate with A. were thwarted by mother.  He also contends that he did not have the means to travel to visit with or search for A.

The trial court found, that while mother and father were both culpable as to why visits did not take place, it did not believe mother was actually trying to hide A. from father.  Instead, the trial court believed that father had not made good faith efforts to find A., and that he had, in fact, "willfully failed to maintain contact" with A. for a period in excess of a year.

The record supports the trial court's finding that father failed to communicate with A. for the statutory period.  Father had various excuses for not seeing A. over the course of six years.  He told the investigator that, after a visit in late 2006, he did not see A. again because he had gotten into an argument with Robert and was afraid to contact him regarding mother's address.  Father also told the investigator that he did not see A. after

10.

that date because he had been working. At the hearing on the petition, father claimed he stopped visiting A. because he no longer had a driver's license or car and had no money and was unemployed. Father testified that he did not try to find mother by contacting her mother because he did not feel he had a relationship with her where he could speak to her. He also claimed he did not know mother's father's name or the names of mother's siblings. Father claimed he tried calling mother's number various times, but that he stopped calling when he did not think he could get through to her. He also testified that he stopped calling when he got an automated message on an answering machine, thinking that meant the phone was disconnected. According to father, he attempted to find mother "here and there" by looking on the Internet when he "got a chance to go to the library."

There was ample evidence on which the trial court could base a finding that these various problems did not prevent father from communicating with A. Although mother moved at times without telling father, she testified that her telephone number did not change and, even though her number was eventually disconnected by Robert, the telephone numbers of her mother and stepfather were the same as they had always been and that father had contacted her at those numbers before. It was up to the trial court to determine witness credibility. (*Adoption of Allison C., supra,* 164 Cal.App.4th at p. 1015, fn. 9.)

Father also argues that he did not intend to abandon A. as evidenced by the fact that he provided A. with as much support as possible under the circumstances and that mother never asked for his support.

It is true that failure to support in the absence of a demand does not necessarily prove the intent to abandon. (*In re George G.* (1977) 68 Cal.App.3d 146, 159.) It is also true that evidence of a parent's inability to pay support rebuts the presumption of abandonment. (*Adoption of Allison C., supra,* 164 Cal.App.4th at p. 1013.) However, where the failure to support is coupled with a failure to communicate, the court may apply the presumption of intent to abandon. (*Ibid.*)

11.

Regarding father's failure to support, we disagree with the notion that mother made no request for support: she requested it in the course of the child custody proceedings and obtained a child support order in the amount of $254 per month. The testimony is unrefuted that during the statutory period preceding the petition to terminate his parental rights, father paid no support. It is true that mother could have enforced the child support order in family law proceedings and made verbal demands, but father's duty to support pursuant to a valid support order did not evaporate just because mother did not seek formal redress for failure to pay. (*County of Orange v. Smith* (2002) 96 Cal.App.4th 955, 962.)

In any event, father's failure to provide support, coupled with his lack of communication is sufficient evidence of his intent to abandon A. and we reject his claim to the contrary.

Finally, when considering whether to terminate a parent's rights, the court must liberally construe section 7822 to "serve and protect the interests and welfare of the child." (§§ 7800, 7801.) The court also "should consider the wishes of the child." (*In re B.J.B., supra,* 185 Cal.App.3d at p. 1208.) The evidence showed that father had not been a part of A.'s life for the past six years and that ten-year-old A., who was represented by counsel at the hearing, did not wish to see father. Father introduced no evidence to the contrary. Substantial evidence supports the court's finding it was in A.'s best interests to terminate father's parental rights.

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.