Filed 2/13/14  In re Daniel R. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re DANIEL R., a Minor. | |
| MEGAN N. R., | F067652 |
| Petitioner and Respondent, | (Super. Ct. No. S-1501-AT-3059) |
| v. | **OPINION** |
| JOSE R., | |
| Objector and Appellant. | |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Stephen D. Schuett, Judge.

Carol A. Koenig, under appointment by the Court of Appeal, for Objector and Appellant.

No appearance for Petitioner and Respondent.

-ooOoo-

[*]Before Cornell, Acting P.J., Detjen, J. and Hoff, J.[†]

[†]Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Appellant Jose R. (father) appeals from the trial court's order terminating his parental rights pursuant to Family Code section 7822.[1]  He contends there was insufficient evidence to support the findings that he "left" his child and did so with the intent to abandon.

We disagree and affirm the court's order.

## FACTS AND PROCEDURAL HISTORY

In 2005, father and Megan R. began dating.  At the time, father was 25 years old and Megan was 16 years old.  When Megan's parents found out about the relationship, they told Megan she could not see father and continue to live in their home.  Megan chose to move in with father, who still lived with his wife.  Megan became pregnant, and father and Megan's son Daniel R. was born in December 2006.  The relationship lasted just under two years.  Megan reported that the relationship came to end when father's wife became angry with father and called the police.  Father was arrested for having sex with a minor, and Megan was arrested for resisting arrest.

Following the incident with the police, Daniel was placed in foster care for a short time.  Megan went back to live with her parents, and Daniel was returned to her care.  Daniel was extremely young the last time father had contact with him.  Mother reported that Daniel was about three months old the last time father saw Daniel.  Father believed the last time he saw Daniel was in January 2007, when Daniel would have been less than two months old.  Around Christmas 2007, father's girlfriend (the current girlfriend) delivered a gift for Daniel and asked to take photos of Daniel.  Father never provided any support for Daniel.

Sometime in 2007, father filed a paternity case regarding Daniel.  In the family law case, Megan was granted sole custody of Daniel in May 2008.

_____

[1]Subsequent statutory references are to the Family Code unless otherwise noted.

2.

On July 23, 2008, father was convicted of unlawful sex with a minor based on his relationship with Megan. At the sentencing hearing, the court stated: "[Father] is ordered to have no contact with the victim [Megan], with the victim's family; however, that—Court recognizes that there may be familial issues that supersede this, and I will defer to the Family Law Court for purposes of those proceedings." Father was sentenced to one year in county jail, but he was released from custody on October 29, 2008.

On August 4, 2008, in the family law case, Megan was again awarded sole custody of Daniel, and the court ordered that visits between father and Daniel "shall be as mutually agreed or until the father comes back into court for orders."

After father was released from jail, the terms of his probation required him to stay away from Megan and all minors. In addition to Daniel, father has two other children, Joseph, who is about two years older than Daniel and is his son from a previous marriage, and Mariah, who is about three years younger than Daniel and is his daughter with the current girlfriend. Thus, the probation terms prohibited him from seeing any of his three children.

Father filed a motion to modify the probation terms so he could see his other two children, but he did not include Daniel in the modification request. On March 6, 2009, the trial court modified father's probation terms to allow him to have contact with his other children as long as a responsible person was present.

On August 26, 2011, Megan filed a petition to declare Daniel free from the parental custody and control of father under section 7822. She alleged that father had never established a relationship with Daniel and failed to support him financially. She alleged that father was awarded visitation as mutually agreed upon on August 8, 2008, but he never sought visitation. Father objected to the petition.

On April 19, 2013, the court held a trial on the petition. Megan testified that father had never supported Daniel financially and had not visited with him since Daniel was three months old. Daniel was six-and-a-half years old at the time of trial. Father

never contacted her to ask for visitation with Daniel. He never sent Daniel any letters or photos. The only gift he ever gave Daniel was a present his girlfriend delivered when Daniel turned one. Megan is married and her husband intends to adopt Daniel if the petition is granted.

In 2007, father sent Megan letters in which he discussed Megan, father, and Daniel being a family. Megan did not understand the letters to be requests to see Daniel. Instead, she believed "he was trying to make everything sound nice so [she] wouldn't testify against him in [the] criminal case." Regarding the criminal case, Megan said her parents called the police after Megan moved in with father.

At the time of trial, Megan had the same phone number and address as when father knew her. So if he remembered either of them, he would know how to contact her. Megan worked at the deli section of a Wal-Mart. In May 2011, she saw father at the Wal-Mart; he was at the cash registers. A few weeks or months later, the current girlfriend tried to approach Megan at the deli. Megan did not talk to the current girlfriend. Megan did not recall father attempting to talk to her. Megan thinks father is unstable and a criminal. She believes that "if he had contact with [her] son[,] … he would be a flight risk."

Father called as witnesses two attorneys who had represented him in the past. Dominic Eyherabide, an attorney in the Public Defender's office, represented father in two or three criminal cases, including the case charging father with unlawful sexual intercourse with a minor in which Megan was the victim. (Eyherabide recalled there were three separate filings against father, which included charges of unlawful sexual intercourse and domestic violence and involved "multiple" victims. Father entered a plea on the charges related to Megan, and the remaining cases were dismissed.

Soon after he got out of jail on probation, father contacted Eyherabide. He asked if the probation terms could be modified so he could have visitation with one or more of his children. Eyherabide advised father not to ask for a modification too soon and

4.

suggested the court would like to see his good behavior on probation first. Eyherabide advised father not to seek visitation with Daniel because his mother was the victim in the criminal case and father was ordered to stay away from her. He testified that, in his experience, probationers are vulnerable to probation violations if they try to have contact with children under those circumstances. Eventually, Eyherabide filed a motion on father's behalf to modify probation terms as to two of father's children.

Father also wanted to ask the court to reduce the felonies to misdemeanors and terminate probation. Eyherabide went back to court twice in 2010 at father's behest, although Eyherabide said, "I think I kept putting him off a little bit." But "[Father] wanted to clean his record, get off probation get away from the stay-away orders. And then he could, you know, [have] his rights reestablished." The requests were opposed by the district attorney's office. Eyherabide said one request was withdrawn after the court indicated that it would be denied. It appears from his testimony that Eyherabide made another request to reduce the felony charges to misdemeanors after father completed probation, and this request was granted.

In cross-examination, Eyherabide testified that he never told father not to seek visitation with Daniel. He agreed that, if father had asked him to do so, he would have filed a motion to modify the probation terms to allow father to see Daniel.

Ira Stoker represented father in filing the paternity action regarding Daniel. Stoker could not recall when the case was initiated, but toward the end of the family law case, father was taken into custody on the charge of unlawful sex with a minor. The result of the family law case was that father had visitation with Daniel. Later, after father got out of jail, he called Stoker to try to "reinstate or initiate custody/visitation" with Daniel. Father could not pay the retainer fee for Stoker's services, however.

Father testified that he never had any intention of not seeing Daniel again. He admitted that he never paid support for Daniel. He had not been employed for years. In

5.

2007 and 2008, father wrote letters to the current girlfriend in which he expressed his desire to see all his children.

After he got out of jail, father wanted his probation terms modified so he could see all his children. He only sought modification with respect to his other two children. Asked whether it was true that he did not include Daniel in his modification request, father responded, "Upon my lawyer's advice, he recommended me to."

Father could not afford Stoker's services for his family law case regarding Daniel. He tried to use a service called "We the People" to help him file court papers. Father tried to file paperwork asking for visitation with Daniel, but, he said, "I believe something in the paper came back incomplete or something. I don't recall." Then he called Stoker. Father was asked if, from 2008 to 2011, he ever successfully filed anything with the court asking for visitation with Daniel. He responded, "Well, I ended up at one point paying Mr. Stoker to help me in this matter, but I don't know what happened. I got postponed or something because I had a criminal case pending."

At the time of trial, the current girlfriend had known father for six years. She testified that father always talked about Daniel. The current girlfriend tried to talk to Megan at the deli at Wal-Mart, but Megan would not talk to her. It was father's idea that the current girlfriend talk to Megan; he could not talk to her because he was on felony probation. The current girlfriend was present when father's mother tried to call Megan's family once in 2007, but no one answered.

In his closing statement, Megan's attorney told the court that the standard for granting the petition had been met as the record showed father never paid a penny of support and had no visitation since the child was three months old. He asserted that being in jail or on felony probation was no defense and father could have sought a modification of his probation terms to allow him to see Daniel (as he had done for his other two children) or asked for visitation with Daniel from the family court.

6.

Father's attorney argued that father's statements to his attorneys and the letters he wrote to the current girlfriend "where he states intent to maintain a family" showed father never "formed the intent not to have a relationship with his child," but "[c]ircumstances have prevented it .…"

Counsel appointed to represent Daniel supported termination of father's parental rights. She argued, "It appears to me that [father] will take the first step to try to reach out to the children, but the second a roadblock comes up in his [way] that makes it difficult for him, he doesn't want to proceed beyond that."

On June 4, 2013, the court issued a written ruling granting Megan's petition. The court explained:

> "The failure to provide support or failure to communicate is presumptive evidence of the intent to abandon. (§ 7822, subd. (b).) In this case there is no dispute that [father] has failed to do either since 2007 and, under section 7822(b), there is a presumption of abandonment. The issue is whether [father] has presented evidence to rebut the presumption.
>
> "In determining the issue of whether a parent has 'left' his or her child with another person, the focus is 'on the voluntary nature of a parent's abandonment of the parental role rather than on physical desertion by the parent.' [Citations.] [N]onaction in the face of a judicial custody order may result in a finding the parent 'voluntarily surrendered' his or her parental role .…
>
> "The case is similar to [Adoption of] Allison C. [(2008) 164 Cal.App.4th 1004 (*Allison C.*)] When Allison was six months old, Allison's father struck Allison's mother while the mother was holding Allison. The mother moved out and cut off contact with Allison's father. The father was incarcerated for two years for domestic violence. When released, he began seeing Allison at a relative's house every two weeks without the mother's knowledge. After seven months of this, the mother discovered this and stopped the visitation. Shortly afterward, father was incarcerated for burglary. The father sent Allison cards from prison until the mother successfully requested that prison officials stop him from contacting her. Two years later, the father was released from prison and the court issued a restraining order against him that permitted him to have weekly supervised visitation with Allison. However, father's parole officer prohibited the visits after mother asked the parole officer to have father drug tested twice

weekly to ensure Allison's safety. The father's parole conditions still permitted him to contact Allison by telephone and mail with the parole officer's approval, but he never sought approval. Another year passed with no contact and the mother's new husband filed a petition to terminate the father's parental rights under section 7822. The trial court found the father had abandoned Allison by failing to communicate with her or provide support for the statutory period. The Court of Appeal affirmed. In holding that there was sufficient evidence to support the finding of an intent to abandon, the court observed, among other things, that the father failed to seek permission to contact Allison by telephone or mail while he was on parole.

"[Father] contends that he cannot have had the subjective intent to abandon Daniel, in part, because he was on felony [probation] with [a] condition prohibiting his contacting [Megan] or seeing Daniel. However, by his action he pled to the charges that resulted in the conviction and the subsequent conditions of [probation]. It is similar [to] the claim that has been rejected by the courts that incarceration is in and of itself a defense to abandonment.… [Father] also contends that his contacts with his public defender and his family law attorney evidence his subjective intent to maintain contact with Daniel and, but for the probation conditions, he would have been able to pursue visitation with Daniel. However, the evidence does not support that claim.

"Subsequent to the commencement of his probation, [father] did have his probation conditions modified to see his other children.… While it may be argued that these steps were on the advice of his public defender, it is also clear that [father] failed to … pursue any modification of the Family Court's orders. The sentencing judge had already indicated his willingness to defer to the Family Court and [father's] attorney had been present when the Family Court entered an order regarding visitation. While [father's] family law attorney testified that [father] was unable to pay the necessary retainer, it was also established that [father] had instituted the paternity action in 2007 and made his initial filings in pro per with the assistance of a typing service.

"In reviewing these steps that [father] took and in light of the failure to take any action other than to seek a termination of his probation, the court concludes that these steps are token and are insufficient to overcome the presumption of abandonment."

On June 17, 2013, the court filed a judgment declaring Daniel free from father's parental custody and control. Father filed a notice of appeal on July 18, 2013.

## DISCUSSION

Section 7822 allows the court to declare a child free from the custody and control of a parent who "has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).) "[F]ailure to provide support[] or failure to communicate is presumptive evidence of the intent to abandon." (§ 7822, subd. (b).) If a parent has "made only token efforts to support or communicate with the child, the court may declare the child abandoned .…" (*Ibid*.)

We apply the substantial evidence standard of review to the trial court's findings made under section 7822. (*Allison C*., *supra*, 164 Cal.App.4th at p. 1010.) "Under the substantial evidence standard of review, '"[a]ll conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment."' [Citation.]" (*Id*. at pp. 1010-1011.) The appellant has the burden of showing the trial court's finding or decision is not supported by substantial evidence. (*Id*. at p. 1011.)

"[A] section 7822 proceeding is appropriate where 'three main elements' are met: '(1) the child must have been left with another; (2) without provision for support or without communication from … his parent[] for a period of one year; and (3) all of such acts are subject to the qualification that they must have been done "with the intent on the part of such parent … to abandon [the child]."' [Citation.]" (*Allison C*., *supra*, 164 Cal.App.4th at p. 1010.)

In this appeal, father contends substantial evidence did not support the court's findings that (1) father "left" Daniel and (2) he had the intent to abandon him. Father admitted that he has not communicated with Daniel since 2007 and has never supported him financially.

9.

As the trial court correctly stated, "[i]n determining the threshold issue of whether a parent has 'left' his or her child, the focus of the law is 'on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent.' [Citations.]" (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 504 (*Marriage of Jill & Victor D.*).) While "a parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order …, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child [citation]." (*Ibid.*)

Father asserts that "careful review of the available evidence reveals that there was not substantial evidence that [father] left Daniel for a period of one year .…" To support this assertion, father points to evidence of actions he took in each year of Daniel's life. In 2007, father filed a paternity action, wrote letters to Megan, and had the current girlfriend deliver Daniel a gift at the end of the year. Therefore, he claims, there can be no "leaving" in 2007. In 2008, he filed papers for visitation on his own but they were returned as incomplete. Also in this year, the family law court granted Megan custody of Daniel but allowed visitation as mutually agreed, and father was convicted of having sex with a minor and ordered to stay away from Megan and all minors.

Then from 2008 through 2011, father was prohibited from contacting Megan, her family, or Daniel by the terms of his probation. He acknowledges that he did not ask to modify his probation terms with respect to Daniel.

We agree with the trial court that this case is similar to *Allison C.*, *supra*, 164 Cal.App.4th at page 1004. Since the trial court succinctly described the relevant facts of *Allison C.* in its written decision, we will not summarize the facts again. In *Allison C.*, the father argued that his incarceration was involuntary and that the mother "tried 'at every turn to cut off any contact between Father and his daughter,'" and, as a result, there was insufficient evidence that he "left" Allison with her mother. (*Id.* at p. 1011.) The Court of Appeal rejected the father's argument, observing that, by his voluntary act of

10.

domestic violence (which led to his incarceration), the father left Allison in the mother's care and custody. Thereafter, he never sought to take parental responsibility for Allison's care. (*Id.* at p. 1012.) Even when the father did visit Allison at his relative's house, "he did so secretly, rather than seeking custody or visitation rights." (*Ibid.*) Finally, the "[m]other's efforts to curtail father's communication with Allison … [did] not negate the reality he never sought to take custody or care of the child after [the mother moved out]." Thus, the father "voluntarily abdicated the parental role," and there was sufficient evidence to find that the father left Allison in her mother's care and custody for more than one year. (*Ibid.*)

We recognize that, in the present case, unlike in *Allison C.*, father did seek visitation with Daniel through the family law court, initiating a paternity case in 2007. In fact, he obtained a court order allowing visitation as "mutually agreed" in August 2008. Father, however, never sought visitation with Daniel pursuant to the court order. He argues that he could not see Daniel because of his probation terms, but, like the domestic violence and other criminal acts in *Allison C.*, it was father's voluntary act of engaging in an unlawful sexual relationship with Megan that led to his incarceration and the probation terms that he stay away from Megan and all minors. Father never sought to have the probation terms modified so he could have a relationship with Daniel even though the sentencing court indicated that it would defer to the family law court on the issue of contact with Daniel. (See *Allison C.*, *supra*, 164 Cal.App.4th at pp. 1008, 1012 [father never sought custody or visitation and never tried to obtain parole agent's prior approval for contact with child].) Nor did father ever provide any financial support for Daniel. This was sufficient evidence for the court to determine that, at least after August 2008, father voluntarily abdicated the parental role and left Daniel in Megan's care and custody.

Father claims that his failure to seek modification of his probation terms so he could have contact with Daniel cannot be considered evidence of parental inaction

11.

because he relied on the advice of an experienced public defender. We are not persuaded. Father knew it was possible to modify the probation terms, and he successfully modified the terms as to his other two children. Eyherabide never told father not to seek visitation with Daniel, and he testified he would have filed a modification request for Daniel if father had asked him to do so. Eyherabide also testified that father requested that Eyherabide seek reduction of father's felony charges to misdemeanors. Eyherabide filed two such requests, although the attorney "kept putting [father] off a little bit," suggesting that father was able to be persistent with his attorney when there was something he wanted. This, in turn, shows that father did not always simply follow the advice of his public defender. In sum, the trial court was not precluded from considering the fact that father did not seek modification of his probation terms as to Daniel in determining whether he "left" Daniel, and there was sufficient evidence to support the finding that father did leave Daniel within the meaning of section 7822. (See *Marriage of Jill & Victor D.*, *supra*, 185 Cal.App.4th at pp. 505-506 [father's inaction in face of court order restricting contact with children, including not seeking modification of order for over three years, was substantial evidence father left children within meaning of § 7822].)

Father next argues that there was insufficient evidence of father's intent to abandon. We disagree. As the trial court correctly noted, a parent's failure to provide support or to communicate with his child is presumptive evidence of the intent to abandon. (§ 7822, subd. (b); see *Allison C.*, *supra*, 164 Cal.App.4th at p. 1013 [father's failure to communicate with child coupled with nonsupport sufficient to show intent to abandon].) Since father did not support Daniel at any time and did not communicate with Daniel after 2007, the issue for the trial court was whether father presented evidence to rebut the presumption of intent to abandon.

The question of intent, including whether father overcame the statutory presumption of intent to abandon, was a question of fact for the trial court. (*Marriage of*

12.

*Jill & Victor D*., *supra*, 185 Cal.App.4th at p. 506.) Father need not have intended to abandon Daniel permanently; it is sufficient that he intended to abandon him during the statutory period. (*Ibid*.)

Father claims he was "tenacious in his desire to have visitation of Daniel, but one attorney wouldn't file the papers, and he could not afford the fee for the second attorney." It is not true, however, that Eyherabide "wouldn't file the papers." He testified that he would have requested a modification of the probation terms as to Daniel if father had asked him to. In addition, father's hazy testimony about his efforts in the family law case did not necessarily demonstrate tenacity. (He testified, "I believe something in the paper came back incomplete or something. I don't recall." Asked what he did in the family court matter from 2008 to 2011, he testified that he paid Stoker, "but I don't know what happened." The trial court determined that the steps father took were insufficient to overcome the presumption of intent to abandon. We cannot say the evidence compelled a finding that father rebutted the presumption of intent to abandon as a matter of law. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 [where appellant had burden of proof at trial, question for reviewing court is whether evidence compels finding in favor of appellant as matter of law].) In other words, there was sufficient evidence for the trial court to determine that father intended to abandon Daniel for the statutory period.

## *DISPOSITION*

The trial court order is affirmed.

13.