Filed 5/2/14  Adoption of S.L. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Adoption of S.L., a Minor. | |
| MIGUEL L., | |
| Plaintiff and Respondent, | G048929 |
| v. | (Super. Ct. No. AD78598) |
| DANIEL C., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald P. Kreber, Judge.  Affirmed.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

William D. Caldwell, under appointment by the Court of Appeal, for Plaintiff and Respondent.

\*          \*          \*

Appellant Daniel C. (Father) is the natural father of S.L. (Child). He challenges the sufficiency of the evidence to support the orders terminating his parental rights under Family Code sections 7822 (parental abandonment) and 7825 (parent convicted of a felony). (All statutory references are to this code.) Respondent Miguel L. (Stepfather) is the stepfather of Child, and the husband of Child's mother (Mother). We conclude substantial evidence supports the section 7822 order and affirm. Therefore, we do not address the sufficiency of the evidence to support the section 7825 order.

**FACTUAL AND PROCEDURAL BACKGROUND**

Father's opening brief contains an integrated statement of the case and facts, which Stepfather adopts and joins in with certain small exceptions. We agree Father's integrated statement of the case and facts provides a sufficient factual and procedural background for the issues presented in this appeal. Hence, we recite it in full below, with a few nonsubstantive changes such as omitting the record references and referring to the parties as Father, Stepfather, Child and Mother, rather than using their names or initials.

*Foundational History*

When this case came to the attention of the trial court, Mother and Stepfather were living together in Orange County and caring for then six-year-old Child. Father was incarcerated serving a three-year sentence on convictions for assault with a firearm, felony kidnapping, and burglary. The assault with a firearm and kidnapping convictions were based on an incident in 2009, and involved Child. Mother and Father's respective recollections of that incident differ slightly.

According to Mother, Father came to Mother's home in July 2009 to drop off Child after a visit. He asked Mother for money, engaged her in a verbal dispute, and then went into her bathroom and loaded a gun. While Father was in the bathroom, Mother and a male neighbor who was visiting the home went into Mother's bedroom for protection. Father then exited the bathroom, saw the neighbor in Mother's bedroom,

became enraged, and hit the neighbor with the gun. Father subsequently went outside to talk to the neighbor, but then reentered Mother's home through a window, grabbed Child, and sped off at high speed with Child in a car. Mother called 911. The incident ended approximately two hours later, when Father agreed to drop Child off at his parents' restaurant.

Mother reported that Child witnessed the altercation between Father and the neighbor, and that Child was crying and distraught during the incident. She further claimed that Father called her after absconding with Child, put Child on the telephone, and told Child to tell Mother to call off the police. According to Mother, Child was shaking and looked worried when she picked Child up from Father's parents. Child continued to shake and threw up twice after getting home, and Child was scared of the police for months following the incident.

Father agreed that he got into an altercation with a man in Mother's home, and that he hit the man with a gun and then absconded with Child. However, according to Father, he and Mother were still seeing each other at the time, and he walked in on Mother and the man in bed immediately after arriving at Mother's home. Father claimed that he absconded with Child because: (1) he was in love with Mother at the time and was upset to find her with another man; and (2) he worried about leaving Child in the home with a strange man. Father claimed that he immediately dropped Child off at his parents' restaurant. He denied that Child was screaming when he took her from Mother's house, but admitted Child was crying.

After Father was incarcerated for kidnapping Child, Mother secured a restraining order in family court that prohibited Father from contacting Child until January 2016.

Father's criminal history also includes convictions for reckless driving, possession of a controlled substance, and possession of a controlled substance with intent to sell.

3

*Stepfather's Adoption Request and Nancy Ward's Investigation*

On September 15, 2011, Stepfather filed a request to adopt Child.

During a subsequent adoption investigation, Mother informed Court Investigator Nancy Ward (Investigator Ward) of Father's incarceration and the restraining order preventing Father from contacting Child. Mother reported that Father had visited Child every other week for a brief period of time when Child was two, but had never paid child support, and had not seen Child since his incarceration in July 2009.

Stepfather and Mother both reported that Stepfather had been involved in parenting Child since Child was one year old. The couple further reported that they had recently been married, that Child knew Stepfather as her father and called him "daddy," and that Stepfather considered Child to be his child.

On April 14, 2012, Father wrote Investigator Ward a letter expressing his opposition to Stepfather's adoption request. Father confirmed that he was incarcerated and unable to see Child. However, he expressed love for his daughter, and reported he hoped to see Child as soon as possible.

Investigator Ward ultimately advised the court to grant Stepfather's adoption request.

*Stepfather's Petition to Declare Child Free from Parental Custody and Control, and Silvia Vasquez's Investigation*

On December 5, 2012, Stepfather filed a petition to declare Child free from Father's custody and control. The petition claimed that Father had: (1) intentionally abandoned Child under section 7822; and (2) been convicted of felonies that made it detrimental for him to maintain parental rights to Child under section 7825.

A hearing on Stepfather's petition was initially scheduled for February 1, 2013. But Father filed a motion asking the court to continue the hearing so that he could seek legal counsel. The court appointed an attorney to represent Father and continued the hearing several times.

4

Meanwhile, during an initial investigation by Court Investigator Silvia Vasquez (Investigator Vasquez), Mother and Stepfather repeated the reports they had made to Investigator Ward. They further claimed that Child had no memory of Father and believed Stepfather was her biological father.

Father was released from jail on June 18, 2012, and he met with Investigator Velazquez soon thereafter. During that meeting, Father reported that he and Mother were a couple when Mother was pregnant with Child, and that they remained together until Child was one year old. He further claimed that he and Mother shared custody of Child after their separation, and that he maintained consistent and regular contact with Child until July 2009, when Child was three-and-one-half years old.

Father reported that he had lost contact with Child only because he was incarcerated and because Mother's restraining order prevented him from contacting Child. He reported that the judge who issued the restraining order had told him that he could modify the order after he was released from jail. Nevertheless, Father provided the investigator with paperwork showing that he had attempted to modify Mother's restraining order five times between May and August 2012, while he remained incarcerated.

Father reported that he had obtained a full-time job. He expressed a desire to resume father-daughter visits and to provide child support for Child. He claimed he had been paying Mother $500 a month in child support until he was incarcerated in 2009.

According to Investigator Vasquez, Father presented as genuinely upset about the effort to terminate his parental rights, and honest and remorseful about his criminal history, including the kidnapping incident. Investigator Vasquez opined that Father "presented as a man who want[ed] to change his life."

After interviewing Father, Investigator Vasquez interviewed Father's parole officer, who confirmed that Father was employed. The parole officer also informed the

5

investigator that Father had been drug testing clean since his release from jail, and that the terms of Father's parole prevented him from contacting Child.

Investigator Vasquez then interviewed Mother again. Mother contradicted her prior reports by agreeing that Father had seen Child "frequently" after Child was born, and "on a regular basis" after Mother and Father separated. According to Mother, Child asked about Father after he was incarcerated but eventually stopped asking. Mother continued to deny ever receiving child support from Father, although she admitted that he sometimes helped her with supplies.

After this additional investigation, Investigator Vasquez opined that Father's criminal convictions did not "fit" section 7825. Specifically, the investigator did not believe that Father's kidnapping conviction showed that he had engaged in a pattern of behavior that could be detrimental to Child. The investigator further opined that section 7822 did not apply because Father had regular contact with Child until July 2009 and did not intentionally abandon Child. Investigator Vasquez ultimately advised the court to: (1) deny Stepfather's petition to free Child from Father's custody; and (2) provide Father with supervised father-daughter visits.

*The Hearing on Stepfather's Petition to Declare Child Free From Parental Custody*

A hearing on Stepfather's petition took place on August 16, and 22, 2013. During the hearing, Father testified and continued to express remorse for his past criminal activity, including the kidnapping incident. He also acknowledged and expressed remorse for a history of substance abuse. Father explained that he had participated unsuccessfully in substance abuse treatment programs on two separate occasions, first in 2000, and later in 2005, during the first six months of Child's life. However, he testified that he had stopped using drugs when he went to jail in 2009, that he was now living with his parents, and that he had remained drug free since his release. He also confirmed that he was employed and informed the court that he had obtained his GED and completed a 102-hour parenting course while in jail.

6

Father confirmed that he had repeatedly attempted to modify the restraining order preventing him from contacting Child. He explained that he did not attempt to modify it earlier because he was being moved around and was therefore unable to immediately locate a law library and figure out what needed to be done. Father also testified that he had attempted to modify the restraining order after being released from prison, but was told that he had to wait until the petition to free Child from his custody and control was resolved.

Father maintained a desire to transition into visits with Child and expressed a desire to pay child support. He testified that the conditions of his parole preventing him from contacting Child were dependent on Mother's restraining order.

After hearing testimony, the court recognized that Father had remained sober since his release from prison. Nevertheless, it found that sections 7822 and 7825 applied and terminated Father's parental rights to Child.

## STANDARD OF REVIEW

"An appellate court applies a substantial evidence standard of review to a trial court's findings under section 7822. [Citation.] Although a trial court must make such findings based on clear and convincing evidence (§ 7821), this standard of proof "'is for the guidance of the trial court only; on review, our function is limited to a determination whether substantial evidence exists to support the conclusions reached by the trial court in utilizing the appropriate standard.'" [Citation.] Under the substantial evidence standard of review, "'[a]ll conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment.'" [Citation.] Abandonment and intent "'are questions of fact for the trial judge . . . . His [or her] decision, when supported by substantial evidence, is binding upon the reviewing court. . . . 'The appellant has the burden of showing the finding or order is not supported by substantial evidence.' [Citation.]." (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010, fns. omitted (*Allison C.*).)

7

**DISCUSSION**

Section 7800 et seq. governs proceedings to have a child declared free from a parent's custody and control. The purpose of these types of proceedings is to promote the child's best interest "by providing the stability and security of an adoptive home." (§ 7800.) The statutes are to "be liberally construed to serve and protect the interests and welfare of the child." (§ 7801.)

Under section 7822, a court may declare a child free from a parent's custody and control if the parent has abandoned the child. Abandonment occurs when a "parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, *or* without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3), italics added.)

"Thus, a section 7822 proceeding is appropriate where 'three main elements' are met: '(1) the child must have been left with another; (2) without provision for support or without communication from . . . his parent[] for a period of one year; and (3) all of such acts are subject to the qualification that they must have been done "with the intent on the part of such parent . . . to abandon [the child].'" [Citation.] 'The . . . failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent . . . ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent . . . .' (§ 7822, subd. (b).)" (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1010.)

In this case, the trial court found by clear and convincing evidence (1) Father left Child with Mother, (2) Father did not provide support for or communicate with Child for in excess of one year, except for token attempts to communicate, and (3) all of these acts were done with "an intent to abandon" Child within the meaning of section 7822. Father challenges the sufficiency of the evidence to support these findings. While Father concedes he did not provide support for or communicate with Child for

8

more than a year, he contends he was prevented from contacting Child as a result of his incarceration, Mother's restraining order, and the terms of his parole. Thus, Father concludes the evidence did not show he left Child with Mother, or intended to abandon Child. We are not persuaded.

*1. Substantial Evidence Supports the Finding Father Left Child With Mother.*

Father first contests the trial court's finding he left Child with Mother for more than a year. He argues the term "left" connotes voluntary action, and asserts his incarceration for almost three years was involuntary. So, Father concludes Child "was effectively taken" from him, and no substantial evidence supported a finding that he "voluntarily left" Child within the meaning of section 7822. We disagree.

Father's argument is remarkably similar to the claims rejected in *Allison C.* In that case, the father contended insufficient evidence supported the court's finding he left the child in the mother's care and custody for at least one year. The father argued the term "left" connotes voluntary action and therefore abandonment does not occur when the child is taken from parental custody against the parent's wishes. While acknowledging he was incarcerated at different time periods, the father argued his incarceration was involuntary. He further asserted the mother tried at every turn to cut off any contact between the father and the child, including by obtaining a restraining order against the father, and persuading the father's parole officer to disallow visitation. He concluded the petitioners failed to prove that "'[f]ather voluntarily allowed [m]other to assume custody.'" (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1011.)

The Court of Appeal disagreed, explaining, "'Case law consistently focuses on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent.' [Citation.] [¶] We thus consider whether father voluntarily surrendered Allison's custody and care to mother. We conclude substantial evidence supports the court's finding he did just that. In the summer of 2001 father, by his voluntary act of domestic violence, left Allison in mother's care and custody.

9

Thereafter, he never sought to take parental responsibility for Allison's care, and instead chose to let the child stay with mother. . . .  His actions underlying his incarcerations for domestic violence, burglary, and driving under the influence were voluntary, and in any case, 'being incarcerated does not, in and of itself, provide a legal defense to abandonment of children.'  [Citation.] . . .  Mother's efforts to curtail father's communication with Allison, while relevant to an assessment of whether father *intended* to abandon the child by noncommunication . . . do not negate the reality he never sought to take custody or care of the child after mid-2001.  In sum, he voluntarily abdicated the parental role.  Thus, the court did not err by finding father left Allison in mother's care." (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1011.)

All of the same can be said in this case.  By his voluntary acts of residential burglary, kidnapping, and assault with a firearm, Father left Child with Mother in the summer of 2009.  Thereafter, Father never sought to take parental responsibility for Child's care, and instead chose to let Child stay with Mother.  Father's voluntary actions caused him to be incarcerated, and his incarceration, in and of itself, is not a legal defense to abandonment.  (*In re Rose G.* (1976) 57 Cal.App.3d 406, 424.)  And Mother's efforts to curtail Father's communication with Child, while relevant to an assessment of whether Father intended to abandon Child by noncommunication and nonsupport (issues we discuss below), do not negate the reality he never sought to take custody or care of Child.  In sum, Father voluntarily abdicated the parental role.  Accordingly, the trial court did not err by finding Father left Child with Mother.

*2.  Substantial Evidence Supports the Finding Father Intended to Abandon Child.*

Father next disputes the trial court's finding he intended to abandon Child.  He acknowledges his failure to provide support and to communicate, except for token attempts, constitute presumptive evidence of intent to abandon under section 7822, subdivision (b), but he argues that presumption was rebutted.  Father contends his incarceration, Mother's restraining order, and the terms of his parole prevented him from

10

supporting or communicating with Child. And Father insists he maintained a constant interest in parenting Child, even while he was incarcerated. Hence, Father concludes no substantial evidence showed he intended to abandon Child. Again we disagree.

Once more, Father's argument closely resembles the claims rejected in *Allison C*. In that case, the father left his daughter with her mother after he was incarcerated; the father provided only token support for his daughter for more than three years; the father failed to communicate with her for the same period; and the father argued communication was restricted first by the his incarceration, then by the mother's restraining order, and later by the terms of the father's parole. We held the trial court finding father failed to communicate for more than three years, "coupled with its finding of nonsupport for the same period, are sufficient to show father intended to abandon her for that period." (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1013.)

The circumstances in this case are so similar the same result must obtain. Here, Father left Child with Mother after he was incarcerated. Father did not contest the finding he provided no support for Child for more than one year, and the evidence showed he actually provided no support for more than three years. Father also did not contest the finding he made only token attempts to communicate with Child for more than one year, and the evidence showed he actually failed to communicate for more than three years.[1] And finally, just as in *Allison C.*, Father argued communication was restricted first by his incarceration, then by Mother's restraining order, and later by the terms of his parole. Consequently, we conclude Father failed to rebut the presumption, and there is substantial evidence to support the trial court finding he intended to abandon Child.

---

[1] Father did testify he tried to modify the restraining order multiple times between May and August 2012, but we think that was too little too late. As of May 2012 Father had already failed to communicate with Child for more than two years, and section 7822 requires only a one-year period of noncommunication.

11

## DISPOSITION

For all of these reasons we hold the trial court's order terminating Father's parental rights under section 7822 is supported by substantial evidence. Having done so, we need not address the sufficiency of the evidence to support the alternative order terminating Father's parental rights under section 7825. The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.

12