Filed 10/17/14  In re A.D. CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | |
| MICHELLE D., Petitioner and Respondent, v. ERICA M., Objector and Appellant. | F068823 (Super. Ct. No. VAD007655) **ORDER MODIFYING OPINION AND DENYING REHEARING** [NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the nonpublished opinion filed herein on September 30, 2014, be modified as follows:

On page 12, line one of the fourth full paragraph, replace the word "guardianship" with "freedom from custody" so the sentence now reads:

Here, the petition for freedom from custody was filed by stepmother on July 2, 2013.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

Franson, Acting P.J.

I CONCUR:

_____

Peña, J.

Filed 9/30/14 (unmodified version)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | |
| MICHELLE D., Petitioner and Respondent, v. ERICA M., Objector and Appellant. | F068823 (Super. Ct. No. VAD007655) **OPINION** |

APPEAL from orders of the Superior Court of Tulare County. Harry N. Papadakis, Judge. (Retired judge of the Fresno Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Beth A. Melvin, under appointment by the Court of Appeal, for Objector and Appellant.

Betty E. Blanks for Petitioner and Respondent.

-ooOoo-

Erica M. (mother) appeals from an order terminating her parental rights and freeing her daughter A.D. (now four years old) from her custody and control due to

abandonment under Family Code section 7822.[1]  Michelle D. (stepmother) filed the section 7822 petition as a precursor to adopting A.D.

Mother contends there is insufficient evidence to support the court's findings.  She also contends that the court failed to comply with the Indian Child Welfare Act (ICWA) (25 U.S.C., § 1901 et seq.).  We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

A.D. was born in February of 2010.  Mother and Robert D. (father) were unmarried at the time, and a dispute over custody of A.D. began almost immediately.  Mother had abused prescription drugs throughout her pregnancy with A.D., and she was arrested for a drug offense within days of A.D.'s birth.  Father was awarded temporary physical custody of A.D.; mother was allowed supervised visits.

After mother was released from jail, mother and father briefly shared joint legal and physical custody of A.D.  But at a hearing in May of 2010, the court awarded father sole legal and physical custody and ordered supervised visits for mother.  By October of 2010, the court lifted the requirement that mother's visits be supervised.

In February of 2011, mother failed to appear for a custody hearing because she was afraid of being arrested on an outstanding warrant.  The court rescinded its prior visitation order, confirmed father's custody of A.D., and gave mother reasonable supervised visits at father's discretion.  The court also gave mother the right to put the matter back before the court by filing appropriate pleadings.  Mother claims she never learned of the court's visitation order.

During the following two years, mother did not visit or contact A.D.  Mother claimed it was because she was struggling with depression and addiction, and, not being aware of the visitation order in place, did not believe she had a right to see A.D.  In

---

**1**     All further statutory references are to the Family Code unless otherwise stated.

2.

August of 2012, mother entered a residential treatment program, which she successfully completed in May of 2013.

On May 13, 2013, mother filed a request for visitation and a hearing was set for June 20, 2013. But mother failed to appear for the hearing because she was incarcerated on an unrelated outstanding warrant.

On July 2, 2013, stepmother, who had been married to father since November of 2011, petitioned the court under section 7822 to have A.D. declared free from mother's custody and control. Stepmother also filed a request to adopt A.D.

That same day, father filed the Parental Notification of Indian Status (ICWA-020) stating he had no Indian ancestry. He filed an attachment (ICWA-010) signed by stepmother representing the same lack of A.D.'s known Indian ancestry.

On July 30, 2013, the court investigator for Family Court Services filed her report on the petition for termination of parental rights. The investigator opined that A.D. and stepmother shared a close bond and that A.D. and mother did not. In the report, the investigator noted that father had filed his ICWA-020 indicating he had no known Indian ancestry. The investigator also noted that on July 29, 2013, mother had stated she "ha[d] heard she has Cherokee Indian ancestry in her family[,] but attempts to trace ancestry was not possible as she does not have necessary names and birthdates." The investigator sent mother form ICWA-020 by mail on July 29, 2013, for her completion and return.

The contested hearing on stepmother's petition was held January 10, 2014. At the hearing, mother testified she and father had had a tumultuous relationship and she acknowledged her struggles with drug addiction present at the time of A.D.'s birth. Mother testified that she began twice weekly supervised visits with A.D. in May of 2010, and had about five or six overnight visits with A.D. when they were no longer supervised. But she did not attend a February 2011 custody hearing because she was afraid of being arrested on an outstanding warrant. Mother's failure to appear ended her right to overnight visits and she last saw A.D. January 11, 2011. Mother testified that, although

3.

she stopped abusing prescription drugs when A.D. was born, she fell into deep depression and began drinking heavily. She eventually decided to turn her life around and entered a residential treatment program in the summer of 2012. According to mother, she began asking father to see A.D. within days of completing treatment in May of 2013. When father ignored her text requests, she petitioned for visitation, although she acknowledged that she failed to appear for the hearing on her petition because she was incarcerated on another matter.

Mother acknowledged that she never paid child support to father, but he never asked for support. Mother claimed to have sent A.D. birthday cards and birthday and Christmas gifts, but that she did so anonymously through her own mother (grandmother) because she believed father would not give them to A.D. otherwise. Grandmother took mother's two older children (for whom grandmother was guardian) to visit A.D. a number of times, although a Christmas 2013 visit request was ignored by father.

Father testified that stepmother began taking on a parental role for A.D. when A.D. was eight months old and that A.D. called stepmother "mom." According to father, he denied mother visitation with A.D. prior to January of 2011 when mother was under the influence. Mother did not contact him to ask for visits with A.D. between January of 2011 and May of 2013. Father acknowledged that grandmother asked for visits with A.D., but he denied her visits were "regular." Father had refused grandmother's requests for visits when A.D. was sick; he had also refused her requests since April of 2013 because that was his "choice." Father acknowledged that he had called police on mother on several occasions, once when she was eight months pregnant, not living with him, and she tried to break into his house.

Stepmother testified that she considered herself to be A.D.'s mom. Mother's failure to appear at the June 2013 visitation hearing prompted stepmother to file the freedom from custody petition. Stepmother acknowledged that grandmother and the other two children had visited A.D. in the past. Stepmother denied telling grandmother

4.

that she could not visit again, but she did state she was A.D.'s mom and she could control who sees her.

Stepmother and father both testified that they separated for a brief time in December of 2013 due to the stress of father's mother's cancer diagnosis.

Grandmother testified that she arranged visits with A.D. through father's mother and that she saw A.D. as often as twice a month when A.D. was a baby. She often took mother's other two children along on visits. According to grandmother, her visits became less frequent when stepmother came into the picture and she had been denied visits on occasion because father would not allow it. She last saw A.D. in June of 2013.

After testimony of witnesses and argument of counsel, the court found that mother's failure to contact or support A.D. constituted presumptive evidence of her intent to abandon A.D. In reaching its decision, the court "particularly noted" the following: that mother chose her personal freedom over her concern for A.D. when she failed to appear for a custody hearing; that mother was familiar enough with the court process to have known that she could have asked to have the hearing continued; that mother was not yet ready to regain custody of her older two children, as evidenced by grandmother's testimony, making it likely that mother would "just be in and out of [A.D.'s] life"; and that mother had had no contact and provided no support for A.D. for three years. Although the court stated it had concerns that A.D. might lose contact with grandmother if the petition was granted, and it had concerns about A.D.'s stability with father, it determined that A.D. would have a better chance in the care of stepmother who had mothered A.D. since birth. The trial court then granted stepmother's freedom from custody petition.

**DISCUSSION**

I.  SUFFICIENCY OF THE EVIDENCE TO SUPPORT SECTION 7822 FINDINGS OF ABANDONMENT AND BEST INTERESTS OF THE CHILD

Mother challenges the sufficiency of the evidence to support the trial court's findings under section 7822 that she abandoned A.D. Mother alleges that, while she did not communicate with A.D. for several years, she never intended to abandon her. She also contends that the trial court erred when it found termination of parental rights was in A.D.'s best interest. We disagree.

*General Legal Principles*

"Section 7800 et seq. governs proceedings to have a child declared free from a parent's custody and control. The purpose of such proceedings is to promote the child's best interest 'by providing the stability and security of an adoptive home.' (§ 7800.) The statute is to 'be liberally construed to serve and protect the interests and welfare of the child.' (§ 7801.)" (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1009-1010 (*Allison C.*).)

The court may declare a child free from parental custody and control if the parent has abandoned the child. (§§ 7820, 7822.) As applicable here, abandonment occurs when the child has been left by one parent "in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).) Failure to communicate or provide support "is presumptive evidence of the intent to abandon." (§ 7822, subd. (b).)

The factual determination of intent to abandon is made by objectively measuring the parent's conduct. (*In re B.J.B.* (1986) 185 Cal.App.3d 1201,

6.

1212.)[2] The parent need not intend to abandon the child permanently; instead, the parent's intent is viewed during the period of time specified in the statute. (*Allison C., supra,* 164 Cal.App.4th at p. 1015; *In re Daniel M.* (1993) 16 Cal.App.4th 878, 881.)

Absent a finding of abandonment, the trial court cannot terminate parental rights simply on a "best interests of the child" standard. (*In re Baby Boy S.* (1987) 194 Cal.App.3d 925, 933.) In a section 7822 proceeding, the petitioner bears the burden to prove the elements of abandonment by clear and convincing evidence. If the court finds abandonment, then it must consider the child's best interests before deciding whether to terminate parental rights. (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 156 (*Neumann*).)

Whether a parent has intentionally abandoned a child within the meaning of section 7822 is a question of fact for the trial court. (*Allison C., supra,* 164 Cal.App.4th at p. 1011.)

We review the court's findings for substantial evidence, i.e., evidence that is reasonable, credible, and of solid value. We cannot consider the credibility of witnesses, attempt to resolve conflicts in the evidence, or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the trial court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)

---

[2]    *In re B.J.B., supra,* 185 Cal.App.3d 1201 construed former Civil Code, section 232, Family Code section 7822's predecessor statute, as do other pre-1994 cases in this opinion.

7.

*Abandonment and Best Interests Analysis*

A section 7822 proceeding, as pertinent here, is appropriate where "'three main elements'" are met: (1) the child must have been left with another; (2) without provision for support of or without communication from his or her parent for a period of one year; and (3) all of such acts are subject to the qualification that they must have been done "with the intent on the part of such parent … to abandon [the child]." (*Allison C., supra,* 164 Cal.App.4th at p. 1010, citing *In re Cattalini* (1946) 72 Cal.App.2d 662, 665.)

In determining the first element of whether a parent has "left" his or her child with another person, the focus is "on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 69 (*Amy A.*).) "[A] parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order [citation]; however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child [citation]." (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 504 (*Marriage of D.*).) Therefore, nonaction in the face of a judicial custody order may result in a finding the parent "voluntarily surrendered" his or her parental role. (*Amy A., supra,* 132 Cal.App.4th at pp. 68-69.)

Here, A.D. had been in father's care since May of 2010 when the court awarded father sole legal and physical custody and ordered supervised visits for mother. Eventually, the visits were unsupervised and continued until January of 2011. But mother failed to attend a custody hearing in February of 2011 because she was afraid of being arrested on an outstanding warrant. As a result of mother's failure to attend the hearing, the court rescinded its prior visitation order and reverted to supervised visitation at father's discretion. The court gave mother the right to put the matter back before the court by filing appropriate pleadings.

8.

Although mother claims she wanted to have contact with A.D., she allowed over two years to elapse without returning to court to ask for visitation. Mother testified she used this time to clean up her life and become sober, which is commendable. But from these facts, a reasonable inference could be drawn that mother voluntarily surrendered her parental role and "left" A.D. in the sole care and custody of father for a period of one year within the meaning of section 7822.

Turning to the second element, we first note section 7822, subdivision (a)(3) is written in the disjunctive so that a court may declare a child abandoned by a parent if the parent failed to communicate *or* failed to provide support for the statutory period. The failure to support or communicate with A.D. is presumptive evidence of mother's intent to abandon her. (§ 7822, subd. (b).)

Mother admitted that she never provided any support for A.D. when she was not in her custody, but claims she was not asked to do so. Although the failure to support when a parent does not have the ability to do so or when no demand is made does not, by itself, prove intent to abandon, such failure coupled with failure to communicate may do so. (*Adoption of Allison C., supra,* 164 Cal.App.4th at p. 1013; *In re Randi D.* (1989) 209 Cal.App.3d 624, 630.)

In determining whether a parent has failed to communicate with a child, the trial court should consider the frequency of times the parent tried to communicate with the child, the genuineness of the effort under all the circumstances and the quality of any communications that occurred. (*In re B.J.B., supra,* 185 Cal.App.3d at p. 1212.)

Here, the trial court had before it ample evidence that mother failed to communicate with A.D. for nearly three years, the bulk of A.D.'s four-year life, triggering the presumption of abandonment. Mother admitted that she had not seen A.D. since January of 2011. She acknowledged that she did not try to telephone her. She made no effort to contact A.D. until May of 2013, after she

9.

completed her substance abuse treatment program. But at that point, she made only "token" efforts to communicate her desire by text messaging father, an effort the trial court found "not reasonable." And when she did file a request for visitation and a hearing was set for June 20, 2013, she again failed to appear because she was incarcerated due to another outstanding warrant.

On the third element, the intent to abandon, mother attempts to rebut the presumption of abandonment by asserting she was limited by father and stepmother in her visits and had to send A.D. birthday cards and Christmas and birthday gifts anonymously through grandmother when grandmother visited A.D. But the evidence presented certainly established abandonment due to lack of communication. To overcome the statutory presumption, the parent must make more than token efforts to support or communicate with the child. (*In re B.J.B., supra,* 185 Cal.App.3d at p. 1212.) "[T]he reality is that parents sincerely interested in maintaining contact, whether by telephone, card or personal visit, with their children, or with the persons responsible for their care, will do so .…" (*In re Rose G.* (1976) 57 Cal.App.3d 406, 420*.)*

Abandonment and intent are questions of fact for the trial court, which the trial court resolved adversely to mother's position. (*Adoption of Allison C., supra,* 164 Cal.App.4th at p. 1011.) Mother essentially asks this court to reweigh the evidence and substitute our deductions for those of the family court. This we may not do. The credibility of witnesses and the probative value of their testimony are questions for the trier of fact. The power to weigh the evidence and resolve issues of credibility is vested in the trial court and not the reviewing court. (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719.)

Mother has failed to meet her burden of establishing that the trial court's findings of abandonment and intent were not supported by substantial evidence,

therefore those findings will not be disturbed on appeal. (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 549.)

Finally, we address mother's contention that there was insufficient evidence to find that terminating her parental rights was in A.D.'s best interests.

If the trial court finds abandonment, then it must consider the child's best interests before deciding whether to terminate parental rights. (*Neumann, supra,* 121 Cal.App.4th at p. 156.) When considering whether to terminate a parent's rights, the court must liberally construe section 7822 to "serve and protect the interests and welfare of the child." (§§ 7800, 7801.) In doing so, the court "shall consider the wishes of the child, bearing in mind the age of the child .…" (§ 7890; *In re B.J.B., supra,* 185 Cal.App.3d at p. 1208.)

In her report on the termination petition, the court investigator stated that stepmother had been

> "a stable and consistent parent for the child for the past 2 1/2 years and she and the child have a significant bond, something lacking between the birth mother and child. [Stepmother] is the only mother figure this child knows. Although it appears [stepmother] and father recently separated for a short period, investigation reveals the matter was resolved within one month and the parties are reunited and currently share a stable and secure relationship. During the brief separation, the child … resided with [stepmother] and her younger sibling .…"

The investigator noted that A.D. was "too young to make a statement regarding these proceedings."

Here, after finding mother had abandoned A.D., the trial court explicitly found that termination of mother's parental rights were in A.D.'s best interests. The trial court stated it was concerned with "what is in the best interest of the child." Noting both father and mother's lack of stability, the trial court stated that its "real concern" was for A.D. to have "a real life and a real home, not a home that's going to break up, and not someone that's going to drop in and out of her

11.

life." Although the trial court bemoaned the fact that it did not have the benefit of time to see if mother's rehabilitation was long lasting, a decision "has to be made today." It then stated:

> "And ultimately what's in the best interest of this child, and if we weigh it out, this child has a much better chance with someone who has mothered the child since she was born, where there is some kind of a home life and we don't have maternal grandmother having her file her guardianship on another child or come back into court again. [¶] Therefore, it will be the order of this Court … to grant the petition."

The test is not whether this court would have made the same order or whether the trial court could have reasonably made some other order, but "'whether the trial court could reasonably have concluded that the order in question advanced the "best interest" of the child.'" (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 595.)

There was substantial evidence to support the trial court's findings that termination of mother's parental rights was in A.D.'s best interest, and we reject mother's contention to the contrary.

## II. SUFFICIENCY OF ICWA INQUIRY

Finally mother contends that the trial court failed to inquire, pursuant to the ICWA, whether A.D. had any Indian ancestry after she indicated to the social worker that she might. Stepmother contends that mother's statement was insufficient to inform the trial court that A.D. was an Indian child, triggering notice requirements. We need not decide whether ICWA notice was required in this case because, if there was error, it was harmless.

The ICWA is meant to protect the interests of Indian children and promote the security of Indian tribes and families by establishing certain minimum standards in juvenile dependency actions. (25 U.S.C. § 1901(3); *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421.) Thus, when a child subject to a dependency proceeding is or may be of Native American heritage each tribe of which the child may be a member or

eligible for membership must be notified of the dependency proceeding and of the tribe's right to intervene in the proceeding. (25 U.S.C. § 1912(a); *In re Nikki R.* (2003) 106 Cal.App.4th 844, 848.) ICWA inquiry and notice requirements apply in a section 7822 proceeding. (*In re Suzanna L.* (2002) 104 Cal.App.4th 223, 226-227.)

Here, the petition for guardianship was filed by stepmother on July 2, 2013. That same day, father filed the Parental Notification of Indian Status (ICWA-020) stating he had no Indian ancestry. He filed an attachment (ICWA-010) signed by stepmother representing the same lack of A.D.'s known Indian ancestry. Stepmother filed a proof of service that those forms had been delivered to mother on July 9, 2013.

In the court investigator's report filed July 30, 2013, the investigator noted that father had filed his ICWA-020 indicating he had no known Indian ancestry. The investigator also noted that on July 29, 2013, mother had stated she "ha[d] heard she has Cherokee Indian ancestry in her family[,] but attempts to trace ancestry was not possible as she does not have necessary names and birthdates." The investigator stated she sent mother form ICWA-020 by mail on July 29, 2013, for her completion and return. There is no evidence in the record that mother completed or returned the form.

At the initial hearing on August 21, 2013, on stepmother's petition, mother was present. She was appointed counsel. At the continued hearing on September 25, 2013, mother was present, represented by counsel, and a contested hearing was set. On November 13, 2013, the matter was confirmed for contested hearing on November 20, 2013. On November 20, 2013, the hearing was again continued, due to the trial court's schedule and the fact that mother was expected to give birth "right away." Although not in the reporter's transcript of either November 13 or 20, 2013, the minute orders for both of those dates state that stepmother was "sworn and examined"[3] and that the court "finds

---

[3]     But the reporter's transcript of that day states neither stepmother nor mother were present.

13.

the child does/does not have known Native American Indian ancestry." At the contested hearing finally held on January 10, 2014, no mention was made of any possible Indian ancestry, although the trial court stated that it had read the investigator's report.

"Deficient notice under the ICWA is usually prejudicial [citation] but not invariably so. [Citations.]" (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1411.) In this case, any deficiency in the ICWA notice was harmless error because there could have been no different outcome even if the tribe had been properly notified and had chosen to intervene.

While the trial court removed mother's parental rights, A.D. was, and always had been in father's custody. There is nothing in the ICWA to indicate that a tribe's interest in an Indian child is paramount to the parent's interest, when that parent (in this case father) has been found by a state court to be a fit parent. Indeed, the ICWA recognizes the fundamental rights of parents to the custody and care of their children, inasmuch as it does not permit a state court to transfer a child custody proceeding involving a child who does not live on the reservation to the jurisdiction of the tribe if either parent objects to the transfer. (25 U.S.C. § 1911(a) & (b).) Thus, the ICWA would not compel, or even allow, a different result in this case, i.e., custody of A.D. to her father who has been found to be a fit parent. Under these circumstances, any failure to give proper notice under the ICWA is harmless error. (*In re Antoinette S., supra,* 104 Cal.App.4th at p. 1413.)

## DISPOSITION

The orders are affirmed.

14.

                                             _____

                                                  Franson, Acting P.J.

WE CONCUR:


_____

Peña, J.


_____

Chittick, J.*

---

\*       Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15.