Filed 3/12/26  In re L.B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re L.B., a Minor. | |
| D.G., | F090096 |
| Petitioner and Appellant, | (Super. Ct. No. FL-23-003456) |
| v. | |
| R.B., | **OPINION** |
| Objector and Respondent. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Joseph R. Distaso, Judge.

Paul Couenhoven, under appointment by the Court of Appeal, and D.G., in propria persona, for Petitioner and Appellant.

No appearance for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Peña, Acting P. J., Meehan, J. and Harrell, J.

Appellant D.G. (mother) appeals from the trial court's denial of her petition to terminate the parental rights of R.B. (father) pursuant to Family Code sections 7822 and 7825.[1]  After reviewing the record, mother's court-appointed counsel informed this court there were no arguable issues to raise on mother's behalf.  This court granted mother leave to personally file a letter setting forth a good cause showing that an arguable issue of reversible error exists.  (*In re Phoenix H.* (2009) 47 Cal.4th 835, 844 (*Phoenix H.*).)  A letter brief filed by mother does not present good cause that an arguable issue exists.  As set forth more fully below, mother's appeal is dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and father, are the biological parents of L.B. (the child) who was born in July 2020.  Mother was awarded sole physical and sole legal custody of the child in May 2022, and father was ordered to have no visitation with the child.  In December 2023, mother filed a petition to terminate father's parental rights.  The petition alleged that father was convicted of a felony pursuant to Penal Code section 273.5, subdivision (a) in September 2022.  The petition further alleged father had not seen the child since the custody order in May 2022, or provided child support in the past two years.  Mother claimed father never bonded with the child due to his arrest from frequent abuse of mother, and the child reportedly had negative reactions to visitation with father in 2021 and 2022.

Father was personally served with a citation to appear for the proceedings on February 8, 2024.  At a hearing held on March 5, 2024, father made his first appearance and was appointed counsel.  Father entered an objection to mother's request to terminate parental rights, and an investigator was appointed pursuant to section 7851.  A court trial was set on father's objection for August 12, 2024.

---

[1]  All further statutory references are to the Family Code unless otherwise stated.

2.

On June 3, 2024, a court investigator filed a report evaluating mother's request to terminate father's parental rights. According to the report, the child was three years old, and she had been in mother's sole custody without any contact with father since May 2022. Father was released from incarceration in December 2023. A domestic violence restraining order was in place to protect mother from father for 10 years. The investigator documented her interviews of mother and father in the report. The court investigator did not discuss the petition with the child due to her age. The child appeared to be pleasant natured and within developmental limits during the investigator's interview with mother.

Mother informed the court investigator that her relationship with father began in 2006. In 2007, mother moved in with father and his mother, and she became a caregiver for father's mother. Father was described as "very demanding" by mother. Mother became pregnant in 2012, but their daughter did not survive a premature delivery at 26 weeks. Father reportedly told mother that she caused the death of their daughter because of stress. Mother dealt with the grief of their loss on her own, and she believed father lacked empathy due to his father's murder. The doctor advised mother to wait a few years to heal before conceiving another child.

In 2016, father and mother moved out of his mother's home. Mother started having obsessive compulsive disorder (OCD) type behaviors while father was micromanaging her actions. For approximately eight months in 2018, mother and father broke up. Mother indicated all her OCD-type behaviors resolved during this time. Mother and father resumed their relationship after father's mother passed away. During mother's pregnancy with the child, father would constantly call her vulgar names and leave the house for the night. She claimed father threw a hot pizza at her, which burned her pregnant stomach.

The child was delivered via cesarean section in July 2020. She was born with a heart defect at 38 weeks into the pregnancy. On the way home from the hospital, father

3.

became upset when mother lost her house key. She recalled being punched in the face by father, and he later punched her while she was nursing the child. Mother also described an incident where father choked her until she passed out in August 2020.

In November 2020, father kicked mother in the chest and hit her in the face, which resulted in a concussion and displaced shoulder. Mother was taken to the hospital, but she was afraid to tell medical staff how she was injured because father stayed in the car with the child. The following month, father called law enforcement during an argument to report that mother pushed him. The officers observed mother's injuries from the previous incident, and she explained how father caused the injuries. Father was arrested by the officers.

Father asked to see the child when he was released from jail. The child attempted to soothe father when he was angry during visits, and he reportedly pushed the child on one occasion. Mother subsequently filed for custody in family court due to her concerns for the child's safety. Mother indicated the child cried during each of father's supervised visits. She claimed the child stopped speaking and regressed in skills during the period of supervised visits, but it was determined that she did not meet the criteria for autism.

The child's last contact with father was in July 2021. Mother was struggling with feelings of guilt for wanting to terminate father's parental rights. She wanted to protect the child from being mentally or physically harmed by father.

The court investigator met with father to obtain information for the evaluation on April 30, 2024. The investigator noted that father rarely made eye contact, and he was often vague in his reporting. Father explained that he had mental health issues that prevented him from doing things outside of the home. Both mother and father struggled with anxiety, which resulted in arguments. Mother's issues with germs and being "overly clean" began in 2017. Father explained that things became " 'really bad' " during mother's pregnancy with the child. He admitted to reacting poorly to mother's anxiety, and he would yell at mother.

The couple's arguments became physical after the child's birth. Father disputed mother's version of events surrounding her injuries in November 2020. He claimed mother fell forward while she was trying to get out of bed. The incident that resulted in father's arrest in December 2020 was only described vaguely by father. Mother informed law enforcement about their domestic violence history when the officers responded to the home, and he was arrested. He eventually bailed out. Father insisted that the criminal charges were dropped due to a lack of evidence.

Father believed mother tried to engage in conflict while recording his visits with the child to " ' make a case' " prior to filing for custody in November 2021. Supervised visits were ordered for father at mediation. He completed several visits until he was arrested on a warrant with three to four charges. Father served 22 months in jail after agreeing to a deal for his felony charges. After his release from custody in December 2023, father was living with family and searching for employment.

According to father, his last contact with the child was in February 2021. He claimed that he paid for child support until his arrest. The investigator inquired about the incident where mother lost her house key at the time of the child's birth because father did not discuss it. Father admitted to slapping mother, and they continued to argue throughout the night. He avoided eye contact and stated that he did not remember when asked about any other incidents involving hitting, kicking, and choking. The investigator asked about his thoughts on mother's request to terminate parental rights. Father became tearful while explaining that he did not want to lose another child.

The court investigator concluded the report by recognizing that father admitted to engaging of acts of domestic violence against mother while in the child's presence. The investigator was unable to confirm the record of father's conviction due to her lack of access. However, there was concern that father was not forthcoming with details about the incidents, and he appeared to lack insight into the significance of his actions. The

lack of accountability raised concerns about the potential risk that father posed to the child.

The parties agreed to continue the court trial to November 4, 2024. On September 30, 2024, father filed a declaration to provide certificates of completion for a parenting program and relationship skills class. The attachments to the declaration also included a progress report for a batterer intervention course. The August 5, 2024 letter stated father completed 30 weeks out of 52 weeks. The court trial was reset to February 10, 2025, due to the unavailability of father's counsel.

The court trial began on February 10, 2025, with testimony from mother. Mother testified that she was in a relationship with father for 15 years, and father became abusive approximately eight years into their relationship. She provided further details of multiple incidents that involved father punching, kicking, and choking her. Father reportedly made threats to kill mother during at least one of the incidents. On another occasion, father told mother that he wanted to cut the child out of her stomach and put her into another women's body while she was pregnant. Mother testified that she suffered a dislocated shoulder, broken arm, and head injury that required stitches after father kicked her in the chest on November 6, 2020.

During the period of supervised visits, mother stated there was a negative effect that resulted from her contact with father. There were concerns that the child was autistic, but she returned to normal after contact with father ceased. Mother stopped receiving child support payments from father in February 2022, but he started to make child support payments again in November 2024. Father's supervised visits were temporarily terminated at a hearing in May 2022. A domestic violence restraining order was eventually granted on September 6, 2023.

Mother's domestic violence advocate testified that mother lived with her from September 2022 to May 2023. On direct examination, the advocate testified that father's supervised visits took place while mother was living with her. She recalled witnessing

6.

the child having night terrors after visits with father. However, she conceded on cross-examination that the supervised visitation took place from late 2021 to early 2022, and she did not live with mother while the child was having supervised visits with father.

Prior to father's testimony, the trial court found that mother did not meet her burden to establish that father intended to abandon the child pursuant to section 7822. In making its determination the court reasoned, "It's hard pressed for the Court to say that [father] has abandoned the child when the Court has specifically ordered him to have no contact with [mother] or the child. The child is listed on the restraining order." The trial court refused to find abandonment based on the evidence presented, and the matter proceeded on the issue of father's felony conviction and unfitness to have future custody pursuant to section 7825.

Father testified that mother developed a fear of any sickness after they lost their daughter as a premature infant. Mother established a number of rules that required father to shower and confine himself to certain portions of the home. The COVID-19 pandemic increased mother's rules for cleanliness in the home.

According to father's testimony, mother swung at him while they were involved in an argument on August 16, 2020. Father pushed mother up against the wall, and he began to choke her. Mother fell to the ground, but he did not believe that she lost consciousness or urinated on herself.

On November 6, 2020, father woke up after mother yelled at him for allowing the bed sheets to touch the ground. Mother did not allow items to touch the floor due to her fear of germs. He claimed mother grabbed the sheet and hit him. Father used his foot to push her away multiple times, but he insisted that she kept coming toward him in an aggressive manner. During the third attempt to push her with his foot, mother fell to the ground face-first. Father drove mother to the hospital, and he stayed in the car with the child while mother received treatment for her injuries.

The court took judicial notice of the case file from father's criminal case. Father pled guilty to a charge of felony battery stemming from the August 16, 2020 incident. After the domestic violence restraining order was granted in November 2021, father did not believe he could contact the child. Father was sentenced to prison for three years on September 27, 2022. Upon his release from prison, father complied with the requirements of his parole by completing a 52-week batterers intervention program, anger management, and parenting classes.

Father acknowledged that it was unacceptable for him to hit mother, and he allowed his anger to get the better of him during the incidents. On cross-examination, father admitted that he made a false statement in a declaration that was submitted by his counsel. The statement asserted that mother's allegations of domestic violence were "breathtakingly false." Father admitted that mother's domestic violence allegations were not false.

Father's sister testified that father lived with her after he was released from prison. There were two children living in their home, and father played with each of the children without speaking in an angry manner. Father's response was to redirect the children if they hit him during a meltdown. She also testified that she never observed father get into fights or hit any family members prior to his arrest.

At the close of evidence, counsel for father argued that the petition should be denied because there was insufficient evidence that the facts of domestic violence proved parental unfitness to have future custody of the child. Mother's counsel requested that the petition be granted based upon father's felony battery conviction, history of domestic violence, and refusal to take responsibility for his actions. After hearing counsel's arguments, the court indicated that its ruling would be put in writing.

On March 4, 2025, the court issued a tentative decision denying mother's petition to terminate father's parental rights. The court acknowledged the escalating acts of violence that resulted in father's conviction for felony domestic violence. However, it

8.

credited father's testimony that he benefitted from his domestic violence programs, and it found that father had undergone significant rehabilitation. The court concluded that mother did not meet her burden of clear and convincing evidence that father would be unable to provide care for the child in the future, and mother's petition was denied.

Mother filed objections to the tentative decision on March 19, 2025. On May 7, 2025, the trial court addressed mother's objections to the tentative decision in a written ruling. The court found that the testimony of mother's domestic violence counselor was not credible due to her conflicting testimony surrounding the timeline of supervised visits between the child and father. Father's testimony regarding mother's fear of germs during the COVID-19 pandemic was found to be credible.

The trial court also noted that mother and father frequently contradicted each other in their testimony, and neither party was found to be more credible than the other due to a lack of corroborating evidence. The court concluded the ruling by adopting its tentative decision to deny mother's petition to terminate father's parental rights. Mother filed a notice of appeal on July 1, 2025.

## **DISCUSSION**

Family Code section 7800 et seq. governs proceedings to have a minor child declared free from a parent's custody and control. (Fam. Code, § 7802; *Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1009 (*Allison C.*).) "A declaration of freedom from parental custody and control … terminates all parental rights and responsibilities with regard to the child." (Fam. Code, § 7803.)

A court may declare a child free from parental custody and control if the parent has abandoned the child. (Fam. Code, § 7822; *Allison C.*, *supra*, 164 Cal.App.4th at p. 1010.) Abandonment may occur when "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (Fam. Code, § 7822, subd. (a)(3).) "The … failure to

9.

provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent … ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent." (*Id*. at subd. (b).) "The parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the intent to abandon the child during the statutory period." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68.) It is not required that the statutory period be the period immediately preceding the filing of the petition. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 922.)

Section 7825, subdivision (a) permits a proceeding to terminate parental rights where: "(1) the child is one whose parent or parents are convicted of a felony. [¶] (2) The facts of the crime of which the parent or parents were convicted are of such a nature so as to prove the unfitness of the parent or parents to have the future custody and control of the child. In making a determination pursuant to this section, the court may consider the parent's criminal record prior to the felony conviction to the extent that the criminal record demonstrates a pattern of behavior substantially related to the welfare of the child or the parent's ability to exercise custody and control regarding the child."

"In accordance with this statutory language, and the fact that the involuntary termination of parental rights is an extreme measure implicating core constitutional rights, section 7825's reach traditionally has been limited to those situations where a parent commits a heinous felony offense, often against a family member, which in and of itself demonstrates that the parent will be forever unfit to have any measure of custody of his or her children." (*In re Baby Girl M.* (2006) 135 Cal.App.4th 1528, 1531 [§ 7825 traditionally limited to situations where parent commits a heinous felony offense].) Parental unfitness must be demonstrated by the facts underlying a felony conviction. (*Id.* at p. 1539.) Permanently terminating parental rights is " 'a drastic remedy to be resorted to only in extreme cases.' " (*Id*. at p. 1535.) The trial court's decision must rest upon

clear and convincing evidence and is reviewed for an abuse of discretion. (*Id*. at pp. 1535-1536.)

In her letter brief, mother asserts the court improperly weighed father's post-rehabilitation efforts, required her to show that termination would benefit the child, and declined to find that abandonment had been proven. She cites to the evidence at trial that was favorable to her request to terminate parental rights such as father's admission to choking her, slapping her, and threatening her.

An appealed-from judgment or order is presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) It is the appellant's burden to raise claims of reversible error or other defect and present argument and authority on each point made. If the appellant fails to do so, the appeal may be dismissed. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.) Having reviewed mother's supplemental brief, we find mother has not made a showing of good cause that an arguable issue exists. (*Phoenix H.*, *supra*, 47 Cal.4th at p. 846.) Mother's letter brief furnishes no valid argument with supporting legal authorities for her purported claim of error. (See *In re Sade C.*, *supra*, 13 Cal.4th at p. 994 [parents must " 'present argument and authority on each point made' "].) Nor does mother show that any claim of error, assuming it was true, constitutes a basis for reversing the underlying orders. Mother, in essence, asks this court to reweigh and resolve conflicts in the evidence, and reject the trial court's conclusions. We are not at liberty to do so.

The trial court expressly considered father's domestic violence conviction and history as presented in testimony and the investigator's report. The court also considered father's post-rehabilitation efforts to complete anger management, batterer's treatment, and parenting classes. Contrary to mother's statements, the trial court reasonably concluded that father's criminal conduct did not prove is unfitness to have custody of the child in the future. Furthermore, there was insufficient evidence to establish any intent to

abandon on father's part given the fact that his contact with the child was prevented by his incarceration and the terms of the restraining order.

In sum, mother has not raised any arguable issues stemming from the hearing denying her petition to terminate parental rights. Further, though we are not required to, we have reviewed the record as it relates to the hearing under, and we have found no arguable issues for briefing. (*Phoenix H.*, *supra*, 47 Cal.4th at pp. 841–842.) Our review of the challenged orders confirms counsel's determination that no arguable issues exist. Accordingly, we dismiss the appeal.

## **DISPOSITION**

This appeal is dismissed.